**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MICHAEL FORD, derivatively on Behalf of TINGO GROUP, INC.,<br><br>               Plaintiffs,<br><br>        vs.<br><br>DARREN MERCER, HAO CHEN, DOZY MMOBUOSI, ROBERT BENTON, JOHN J. BROWN, KENNETH DENOS, JOHN MCMILLAN SCOTT, SIR DAVID TRIPPIER, BRIGHTMAN ALMAGOR ZOHAR & CO., DELOITTE TOUCHE TOHMATSU LLC, DELOITTE & TOUCHE LLP, GRIES AND ASSOCIATES, LLC, AGRI-FINTECH HOLDINGS, INC., GRANT THORNTON NIGERIA, GRANT THORNTON INTERNATIONAL and ERNST & YOUNG AMERICAS LLC,<br><br>        Defendants,<br><br>        and<br><br>TINGO GROUP, INC., f/k/a MICT, INC.,<br><br>        Nominal Defendant. | Civil Action No.:<br><br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**TABLE OF CONTENTS**

<u>Page</u>

I.    INTRODUCTION ................................................................................................................. 1

II.   VENUE AND JURISDICTION ........................................................................................ 5

III.  PARTIES ............................................................................................................................. 6

   A.  Plaintiff ........................................................................................................................... 6

   B.  Defendants ...................................................................................................................... 6

       1.  Nominal Defendant Tingo ...................................................................................... 6

       2.  Defendant Mmobuosi ............................................................................................. 7

       3.  Defendant Mercer ................................................................................................... 7

       4.  Defendant Chen ...................................................................................................... 7

       5.  Defendant Benton ................................................................................................... 8

       6.  Defendant  Brown ................................................................................................... 8

       7.  Defendant Denos ..................................................................................................... 8

       8.  Defendant Scott ....................................................................................................... 9

       9.  Defendant Trippier ................................................................................................. 9

       10.  Defendant Agri-Fin Tech ..................................................................................... 10

       11.  Auditor Defendants ............................................................................................. 10

   C.  Auditor Misfeasance And Malfeasance ..................................................................... 12

   Advisor Defendants .......................................................................................................... 15

IV.  SUBSTANTIVE ALLEGATIONS .................................................................................. 15

   A.  Tingo Mobile's Origins ................................................................................................ 15

   B.  Mmobuosi Sells Tingo Mobile To Agri-Fintech ...................................................... 16

   C.  Agri-Fintech Sells Tingo Mobile To Tingo Group ................................................... 17

D.  Dozy Sells Tingo Foods To Tingo .................................................................. 18

E.  False Financial Statements For Tingo Mobile Were Used To Defraud
    Tingo And To Mislead Tingo Shareholders To Vote To Approve
    Tingo's Acquisition Of Tingo Mobile ............................................................ 18

F.  Deloitte Enabled The Fraud At Tingo ........................................................... 24

G.  Tingo's Materially False And Misleading Proxy Solicited Shareholder
    Votes To Approve The Tingo Mobile Acquisition And Other Propoals ........... 26

H.  May 1, 2023 Proxy Statement ...................................................................... 29

I.  Deloitte's Materially Misleading Audit Opinions Inclusion
    In For Tingo's 2022 Financial Statements And May 2023 Proxy .................. 34

J.  Gries' Materially False And Misleading Audit Opinion ................................. 37

K.  Auditor's Duties To Audit Clients ................................................................ 40

L.  Deloitte USA Has A History Of Lax
    Oversight Over Its Correspondent Branches ................................................ 44

M.  E&Y And GTR And GTI Malfeasance And Misfeasance
    In Connection With Tingo's Acquisition Of Tingo Mobile ............................. 47

N.  Mmobousi Self-Dealing ............................................................................... 48

O.  Tingo False And Misleading Statements ...................................................... 50

    1.  December 1, 2022 Press Release ............................................................. 50

    2.  March 31, 2023 Form 10-K ..................................................................... 51

    3.  March 31, 2023 Press Release And Earnings Call ................................... 54

    4.  May 1, 2023 Form 8-K And Attached Presentation ................................. 60

    5.  May 15, 2023 Form 10-Q ........................................................................ 61

    6.  May 15, 2023 Form 8-K .......................................................................... 63

    7.  May 15, 2023 Earnings Conference Call .................................................. 64

    8.  May 30, 2023 Press Release .................................................................... 65

P.  Hindenburg Research Report ...................................................................... 66

Q.  Subsequent Developments ......................................................................... 71

1. August 31, 2023 Hindenburg Updated Allegations ...................................... 72

2. Board Changes ........................................................................................ 73

V.   DAMAGES TO TINGO ................................................................................. 73

VI.  DERIVATIVE ALLEGATIONS ..................................................................... 74

VII. DEMAND FUTILITY ALLEGATIONS .......................................................... 74

FIRST CAUSE OF ACTION ................................................................................. 81

Against The Individual Defendants For Violations Of Section 14(a) Of The Exchange Act ....... 81

SECOND CAUSE OF ACTION ........................................................................... 84

Against The Individual Defendants For Breach Of Fiduciary Duties ......................... 84

THIRD CAUSE OF ACTION ............................................................................... 86

Against Dozy And Individual Defendants For Unjust Enrichment,
Self-Dealing And Control Person Liability .......................................................... 86

FOURTH CAUSE OF ACTION ............................................................................ 87

Against Individual Defendants For Gross Mismanagement ..................................... 87

FIFTH CAUSE OF ACTION ................................................................................ 88

Against Individual Defendants For Waste Of Corporate Assets ............................... 88

SIXTH CAUSE OF ACTION ................................................................................ 88

Against Deloitte For Aiding And Abetting Breach Of Fiduciary Duty ...................... 88

SEVENTH CAUSE OF ACTION .......................................................................... 89

Against All The Auditor Defendants And Advisor
Defendants For Professional Malpractice ........................................................... 89

PRAYER FOR RELIEF ....................................................................................... 90

JURY DEMAND ................................................................................................ 92

## I.     <u>INTRODUCTION</u>

Plaintiff Michael Ford ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant, publicly traded, Tingo Group, Inc., f/k/a/ MICT, Inc. ("Tingo," "Tingo Group," "TIO" or the "Company"), files this Verified Shareholder Derivative Complaint against Darren Mercer ("Mercer"), Hao "Kevin" Chen ("Chen"), Dozy Mmobuosi ("Dozy" or "Mmobuosi"), Robert Benton ("Benton"), John J. Brown ("Brown"), Kenneth Denos ("Denos"), John McMillan Scott ("Scott"), and Sir David Trippier ("Trippier") (collectively "Director Defendants") and together with Gries and Associates, LLC, Brightman Almagor Zohar & Co., Deloitte Touche Tohmatsu LLC, and Deloitte & Touche LLP, Grant Thornton Nigeria (collectively "Auditor Defendants") and Grant Thornton International and Ernst & Young Americas LLC (collectively "Advisor Defendants") and Argi-Fintech Holdings, Inc. ("AFH") respectively, (collectively "Defendants"). Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the public documents, press releases, and other public statement announcements made by Dozy, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tingo, legal filings, the complaint and other filings by the SEC in *SEC v. Mmobuosi, et al.*, S.D.N.Y. 23-cv-10928 ("SEC Action") news reports, securities analysts' reports and the Hindenburg Report of June 2023. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1.      This shareholder derivative case concerns a publicly traded company, Tingo Group, Inc. formerly known as MICT, Inc. ("Tingo" or the "Company"), which was systematically looted by Defendant Dozy and whose Tingo Mobile supposed crown jewel subsidiary was exposed as a massive fraud in mid to late 2023 perpetrated by its controlling shareholder Defendant Dozy.

2.      Mmobuosi engineered a massive fraud in Tingo. He directly and indirectly profited handsomely from his own self-dealing with and control of Tingo, reaping millions of dollars in illicit profits both through illegal insider sales of large blocks of stock and by looting Tingo's assets.

3.      Dozy's fraud dates back years and pertains mostly to one of the Tingo subsidiary companies, Tingo Mobile, PLC ("Tingo Mobile"), a private Nigerian company Mmobuosi founded that purportedly sources and supplies mobile handsets and related data and application services to farmers in Nigeria.

4.      Dozy foisted Tingo Mobile on Tingo via merger on December 1, 2022. Tingo Mobile was and is a Potemkin village, it had completely fictitious financial statements, customer lists of mobile subscribers and phony bank statements. Tingo Mobile's authentic bank statements subpoenaed by the SEC show that Tingo Mobile was, and is, dormant and broke.

5.      Tingo Mobile became Defendant Mmobuosi's vehicle to access the U.S. capital market although it took him several attempts before he merged Tingo Mobile with publicly traded Tingo. Dozy put Tingo Mobile under the ownership of Defendant Tingo International Holdings ("TIH") a Delaware based company which became Tingo Mobile's parent in 2020. Dozy then fraudulently orchestrated the successive acquisitions of Tingo Mobile: (i) first selling Tingo Mobile from TIH to OTC-traded Defendant Agri-Fintech (then named "iWeb, Inc."

hereinbefore ("AFH")) (which Dozy controlled) in August 2021; and (ii) then selling it again in December 2022 from Agri-Fintech to Tingo (then called "MICT, Inc.") a NASDAQ listed Company.  Each merger assigned a value to Tingo Mobile in the billions of dollars—valuations supported purely by the fabricated financial statements Mmobuosi directed (supposedly audited by each of the Auditor Defendants at various times) and the sham operational success and asset value those fraudulent financial statements purported to depict.  Through these mergers, Mmobuosi assumed control of two publicly-traded U.S. corporations, AFH and Tingo obtaining for himself hundreds of millions of shares in the newly merged companies, as well as access to a public market.

6.      After taking control of Agri-Fintech, Mmobuosi used his position to engage in self-dealing transactions with Tingo which were purportedly supported by the false and fraudulent financial statements of Time Mobile both when it was part of AFH and later after Tingo Mobile was merged with Tingo. Tingo Mobile's inclusion in first AFH, and then Tingo's financial statements, caused them all to have materially overstated their reported sales, earnings and assets in their publicly-disclosed financial statements for each reporting period in which each owned Tingo Mobile as its principal operating subsidiary.  These material misstatements created the false impression that Tingo Mobile was a thriving, multimillion-dollar business adding value to AFH and then Tingo, when, in fact, Tingo Mobile's operations and earnings were fabricated—artificially propping up the price of AFH and then Tingo shares and Mmobuosi's controlling stake in them.

7.      In early 2023, Mmobuosi replicated the Tingo Mobile fraudulent scheme with a new entity, Tingo Foods PLC ("Tingo Foods"), a purported food processor which he sold to Tingo.  Tingo Foods is a Nigerian corporation founded by Defendant Mmobuosi in September

2022 purportedly to operate in the food processing business. In February 2023, Mmobuosi sold Tingo Foods to Tingo for over $200 million. As with Tingo Mobile, Mmobuosi conjured Tingo Foods from thin air—concocting a fictitious business model predicated on non- existent customers and backed by forged financial and bank statements and other falsified documents causing Tingo to incorporate into its own financial statements and report Tingo Foods' fabricated financial results, in addition to Tingo Mobile's, thereby compounding the fraud.

8.      Each of the Defendant Auditors at various times for either AFH, Tingo or Tingo Mobile issued and authored materially false and misleading audit reports. Each of the Advisor Defendants provided consulting and advice to Tingo Inc. in connection with its 2023 acquisition of Tingo Foods.

9.      The fraud was revealed in June 2023 when Hindenburg Research published a report outing Tingo as a sham for, among other reasons, its false representations of Tingo Mobile including falsifying $128 million in revenue generated from its mobile handset leasing, call and data segments, making false statements about being a Nigerian mobile licensee; and making false statements about revenue generated from its online food marketplace called "Nwassa," and issuing materially misleading and false audited annual financial statements.

10.     The Hindenburg Research report called Tingo "an exceptionally obvious scam with completely fabricated financials." On this news, Tingo's stock price fell from a closing price of $2.55 per share on June 5, 2023, to a closing price of $1.32 per share on June 6, 2023. This demonstrates a fall of $1.23 per share, or a 48.2% decrease.

11.     The Hindenburg Research report was corroborated when the SEC investigated Tingo before filing its action against Dozy and based on subpoenaed records determined, *inter*

*alia*, that authentic bank records stated Tingo's bank balance was less than $50 when it auditors had certified financial statements showing over $400 million in cash assets.

12.     Two federal securities fraud class action lawsuits were filed and are pending in the United States District Court for the District of New Jersey (the "Securities Class Actions") against Tingo, et al. causing the Company to incur expenses for defense and exposing Tingo to further loss and damage cause by Dozy and auditors' misfeasance and malfeasance.

13.     The SEC followed suit with its own complaint on December 18, 2023 stating, among other things, "Defendants created fake bank statements, falsified general ledgers, and other forged and doctored documents and submitted them to their auditors and others to substantiate their fabricated financial statements. Defendants also concealed their fraud by buying and registering internet domain names in the names of their made-up suppliers and customers; they then used email addresses from these domains to pose as these entities' representatives in sending company auditors confirmation of the entities' reported balances with Agri-Fintech and Tingo Group."

14.     Of course a scheme of this breadth and depth, involving two public companies and subsidiaries whose financial statements were purportedly audited by Defendants' auditors, could not have succeeded without the misfeasance and malfeasance of the Director Defendants and Auditor Defendants.

## II.     VENUE AND JURISDICTION

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would no otherwise have.

18.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New Jersey or who has minimum contacts with this District to justify the exercise of jurisdiction over them. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## III.    PARTIES

### A.    Plaintiff

20.     Plaintiff is a current shareholder of Tingo and has been since 2022. Plaintiff has continuously held Tingo common stock at all relevant times through this date. Plaintiff is a citizen of the United Kingdom.

### B.    Defendants

#### 1.    Nominal Defendant Tingo

21.     Tingo is a Delaware corporation with principal executive offices at 28 West Grand Avenue, Suite 3, Montvale, New Jersey 07645. Tingo's common stock trades on the Nasdaq under the symbol "TIO." It was formed in 2002 and in 2013 changed its name to MICT,

Inc. ("MICT") before changing it to Tingo Group Inc. Before acquiring Tingo Mobile, Tingo's business was offering stock trading, wealth management and insurance services.

22.     Tingo Mobile represented (falsely) to be a leading Agri-Fintech company operating in Africa, with a comprehensive portfolio of innovative products, including a 'device as a service' smartphone and a value-added service platform.

### 2.     Defendant Mmobuosi

23.     Defendant Mmobuosi is the co-CEO of Tingo, CEO of Defendant AFH, and CEO of Defendant TIH. Defendant Mmobuosi was the CEO of Tingo's wholly owned subsidiary TGH which owned and managed Tingo Mobile and Tingo Foods within Tingo.

### 3.     Defendant Mercer

24.     Defendant Mercer served as a Company director beginning November 2019 and as the Company's CEO beginning April 2020 until he resigned from both positions on September 15, 2023. According to the Form 10-K filed with the SEC on March 31, 2023 (the "2022 Form 10-K"), as of March 31, 2023, Defendant Mercer beneficially owned 15,620,939 shares of Tingo common stock, representing 9.5% of the Company's outstanding. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Mercer received $4,174,837 in total compensation from the Company.

### 4.     Defendant Chen

25.     Defendant Chen has served as the Company's Chief Financial Officer ("CFO") since November 2021. According to the 2022 Form 10-K, as of March 31, 2023, Defendant Chen beneficially owned 300,000 shares of Tingo common stock. Given that the price per share of the Company's common stock at the closing of trade on March 31, 2023 was $1.05, Defendant Chen owned approximately $315,000 worth of Tingo stock as of that date. For the

2022 Fiscal Year, Defendant Chen received $269,640 in total compensation from the Company. Chen signed materially false and misleading financial statements for Tingo included in 10-K reports and 10-Q reports.

### 5.     Defendant Benton

26.     Defendant Benton served as a Company director from April 2021 until he resigned on September 18, 2023. Prior to his resignation, Defendant Benton served as Chairman of the Audit Committee and as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2022 Form 10-K, as of March 31, 2023, Defendant Benton beneficially owned 160,000 shares of Tingo common stock. For the 2022 Fiscal Year, Defendant Benton received $93,981 in total compensation from the Company.

### 6.     Defendant Brown

27.     Defendant Brown has served as a Company director since December 2022 until his resignation effective December 21, 2023. He has also served as a director of AFH previous parent company of Tingo Mobile, since September 2021 and in that capacity signed materially false and misleading 10-Ks which included Tingo Mobile financial statements.

### 7.     Defendant Denos

28.     Defendant Denos has served as interim co-CEO of the Company since September 18, 2023 and as a Company director since November 2022. He signed Tingo's materially misleading 2022 10-K. Defendant Denos has also served as the Executive Vice President, General Counsel, and Corporate Secretary of AFH, the previous parent company of Tingo Mobile, since September 2021 and in that capacity singed materially misleading 10-Ks containing fraudulent Tingo Mobile financial statements. According to the 2022 Form 10-K, as of March 31, 2023, Defendant Denos beneficially owned 45,000 shares of Tingo common stock.

Given that the price per share of the Company's common stock at the closing of trade on March 31, 2023 was $1.05, Defendant Denos owned approximately $47,250 worth of Tingo stock as of that date.

### 8.    Defendant Scott

29.    Defendant Scott has served as a Company director since November 2019 and as the Chairman of the Board since September 19, 2023. He also serves as Chair of the Compensation Committee, Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee in that capacity he signed Tingo's materially false and misleading 2022 10-K. According to the 2022 Form 10-K, as of March 31, 2023, Defendant Scott beneficially owned 530,000 shares of Tingo common stock.

### 9.    Defendant Trippier

30.    Defendant Trippier has served as a Company director since May 17, 2022. Defendant Trippier also serves as the Chair of the Audit Committee and as a member of the Compensation Committee and the Nominating and Corporate Governance Committee and in that capacity he singed Tingo's materially false and misleading 2022 10-K. According to the 2022 Form 10-K, as of March 31, 2023, Defendant Trippier beneficially owned 100,000 shares of Tingo common stock.

31.    Defendants Mercer, Chen, Benton, Ofir, Trippier and Scott signed Tingo's Annual Report on Form 10-K for the period ended December 31, 2021 which was signed June 17, 2022.

32.    Defendants Mercer, Chen, Benton, Denos, Trippier, Scott and Brown signed Tingo's Annual Report on Form 10-K for the period ended December 31, 2022 which was signed on March 23, 2023.

33.     Defendant Brown and Mmobousi, among others not named here, signed AFH's materially misleading Annual Report on Form 10-K for the period ended December 31, 2021 on November 16, 2022.

### 10.    Defendant Agri-FinTech

34.     Agri-Fintech Holdings, Inc. (formerly, Tingo, Inc.) (OTC Markets: TMNA) (hereinbefore identified as "AFH") is a Nevada Corporation based in Draper, Utah. In August 2020, AFH acquired Tingo Mobile from TIH. It is majority owned and controlled since 2021 by Defendant Mmobuosi who has 77% voting control of AFH. In December 2022, AFH sold Tingo Mobile to Tingo.

35.     In late 2023, AFH announced that its Board of Directors approved the liquidation of AFH and the distribution of its holdings in Tingo to the AFH's shareholders (hereinafter, the "Distribution"). Because the Distribution would be made pro-rata to the AFH's stockholders, it will further enrich Dozy at the expense of Tingo.

36.     AFH received its holdings in Tingo, consisting of common stock, Series A convertible preferred stock ("Series A Preferred Stock"), and Series B convertible preferred stock ("Series B Preferred Stock") in connection with its sale to Tingo of Tingo Mobile Ltd., on November 30, 2022.

37.     AFH potentially holds 75% of Tingo's issued and outstanding common stock assuming conversion of all preferred stock held by AFH to Tingo common stock.

### 11.    Auditor Defendants

38.     Grant Thornton Nigeria ("GTN") and Grant Thornton International ("GTI") are public accounting and auditing firms. GTN is a member firm of GTI. GTN was appointed as "External Auditors" to Tingo Mobile PLC in March 2021 and in that capacity certified Tingo

Mobiles financial statements for fiscal years 2021 and 2022 which were used by Dozy to defraud Tingo.

39.     Defendant Gries and Associates, LLC ("Gries") is a public accounting firm which served as auditors of AFH's Balance Sheet and Related Statements of Operations, Changes In Stockholders Equity and Cash Flows for the years ended December 31, 2021 and 2022 while AFH incorporated Tingo Mobile into its financial statements. Gries was sanctioned by the PCAOB for audits of AFH for fiscal year 2021 as part of the sanctions. Its principal, Blaze Gries, was barred from public accounting work for one year. Gries certified AFH's materially false and misleading financial statements which were used by Dozy to defraud Tingo.

40.     Defendant Brightman Almagor Zohar & Co. ("Deloitte Israel") and is a firm in the Deloitte Touche Tohmatsu Limited network. Deloitte Israel falsely certified Tingo's quarterly financial statements for 2023 and its 2022 annual statements. Deloitte Israel resigned as the "independent" registered public accounting firm of Tingo Group, Inc. on January 16, 2024.

41.     Deloitte Touche Tohmatsu Limited ("DTTL") is a UK private company limited by guarantee incorporated in England and Wales. DTTL serves a coordinating role for its member firms and their respective related entities by requiring adherence to policies and protocols with the objective of promoting a consistently high level of quality, professional conduct and service across the Deloitte network. In that capacity it exercised supervision and control over Deloitte Israel and owed duties to Tingo.

42.     Deloitte & Touche, LLP is the accounting arm of Deloitte, LLP, headquartered in the United Kingdom.  Deloitte Israel entered agreements dated as of June 2, 2019 (as amended and restated), with an affiliate of Deloitte & Touche LLP pursuant to which Deloitte Israel as a member form of Deloitte & Touche LLP operated under it umbrella. Deloitte & Touche, LLP is

Delaware limited liability partnership duly organized under the laws of the State of Delaware. It is registered with the PCAOB.

43.     Deloitte Israel was paid $1.6 million in audit fees in 2022 by Tingo.

44.     Deloitte Touche Tohmatsu Limited and Deloitte & Touche, LLP had involvement in, financial interest in, and control over Deloitte Israel (Deloitte Touche Tohmatsu Limited, Deloitte & Touche, and Deloitte Israel collectively referred to as "Deloitte").

### C.     Auditor Misfeasance And Malfeasance

45.     Deloitte Israel has come under recent scrutiny from several media outlets with damaging articles lambasting Deloitte Israel as the auditor for Tingo's 2022 financial statements, with one media outlet stating "Tingo's books, audited by Deloitte Israel, listed a cash balance of a staggering $462 million. However, subsequent investigations by the Securities and Exchange Commission revealed that the company only had $50 in cash, according to a Forbes' report. This massive discrepancy has thrust Deloitte Israel into the spotlight, with experts questioning how such an obvious oversight could occur."[1]  This is especially true given Hindenburg Research exposed this fraud without any of the internal access to books and records, account statements, banks, customers, vendors, licensors, government agencies, and other contacts to which Deloitte Israel would have access.

46.     By virtue of their position as independent accountants and auditors of Tingo, and/or Time Mobile and/or AFH, the Auditor Defendant Deloitte had access to their respective client's key personnel, accounting books and records, and transactional documents, at all relevant times.  As a result of their provision of auditing and other services, each auditor's personnel were

---

[1] Agnidev Bhattacharya, *Deloitte Under Scrutiny After Missing Tingo's Alleged $462-Million Fraud* (January 28, 2024) https://www.ndtvprofit.com/business/deloitte-under-scrutiny-after-missing-tingos-alleged-462-million-fraud

frequently present at their respective client's offices and had continual access to, and knowledge of, each of their client's confidential internal corporate, financial and business information, and had the opportunity to observe and review each client's business and accounting practices, and to test each client's internal and publicly reported financial statements as well as each client's internal controls.

47.     Each of the Auditor Defendants endorsed and signed audit reports for their respective client's which were publicly issued and/or were used to support Dozy's self-dealing transactions with Tingo.

48.     As disclosed in Tingo's 8-K filed on December 26, 2023, following the Securities and Exchange commission ("SEC") complaint against Dozy filed on December 18, 2023, Tingo's audit committee determined on December 23, 2023, based on the SEC complaint and the evidence in the SEC exhibits which contradicts certifications, representations and evidence previously provided by Tingo and its auditors and management, that Tingo's consolidated financial statements for 2022 included in Tingo's Annual Report on Form 10-K for the year ended December 31, 2022 and associated report of Tingo's independent registered public accounting firm, Deloitte Israel, should no longer be relied upon. It was represented in the 8-K that "there have been no (i) disagreements with Deloitte Israel on any matter or accounting principles or practices, financial statement disclosure, or auditing scope or procedure, in connection with its report; or (ii) "reportable events" as defined in Item 304(a)(1)(v) of Regulation S-K, except that Deloitte Israel has advised the Company that information contained in the SEC complaint and other documents filed by the SEC on December 18, 2023 and the Department of Justice sealed indictment filed on November 15, 2023 which was unsealed on January 2, 2024, has led it to no longer be able to rely on management's representations, and has

made it unwilling to be associated with the financial statements prepared by management"
(emphasis supplied).

49.     Each of the Auditor Defendants' audits of Tingo Mobile's financial statements
and/or their respective certifications of their respective client's financial statements which
included Tingo Mobile's results of operations were a sham. The Auditor Defendants could have
easily discovered Tingo Mobile was a fraudulent company upon visiting Tingo Mobile's Lagos
headquarters of operations. According to published reports, the Financial Times visited Tingo
Mobile offices in Lagos, Nigeria, in May 2023 and discovered that  they were thinly staffed in a
rundown building. The Nigeria chief executive and head of technology failed to provide details
on the type of license the company held with regulators in the country's tightly regulated finance
sector. Furthermore, Tingo Mobile's Dubai office, located in the Jumeirah Lake Towers, which
houses the Dubai Multi Commodities Centre free-trade zone, was, according to the Financial
Times reporter, empty when an FT reporter visited in June.

50.     Each of the Auditor Defendants were also negligent, grossly negligent and
committed professional malpractice by failing to detect the blatant fraud of Tingo Mobile's
financial statements which reported hundreds of millions of dollars of cash on account when in
reality the accounts were fraudulent. Defendant Auditors obviously failed to conduct even the
easiest verification measures such as cross checking Tingo Mobile operating numbers against
Nigerian government figure statistics of economic activity. For example while Tingo Mobile
reported NWASSA USD transactions in 2022  amounting to $12-$12.7 billion, Nigeria
government data shows only USD $10.8 billion for the entire country in 2022.

**Advisor Defendants**

51.     Defendant Grant Thornton International was, upon information and belief, one of the advisors to Tingo identified in a Tingo press release in early 2023 who purportedly advised Tingo and vetted its acquisition of Tingo Foods.

52.     Ernst & Young Americas LLC ("EY") is a Delaware Limited Liability Company which coordinates the services of its member person. EY was, upon information and belief, one of the advisors identified in a Tingo 2023 press release who purportedly advised Tingo and vetted its acquisition of Tingo Foods.

53.     The Advisor Defendants negligently and/or recklessly prepared their engagement to Tingo, Inc. and were a proximate cause of Tingo's financial injuries in connection with the acquisition of Tingo Foods.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Tingo Mobile's Origins

54.     In 2001, Dozy founded Tingo Mobile. Dozy portrayed it as an active and profitable supplier of phones and data services to two huge farming cooperatives in Nigeria. Dozy represented Tingo Mobile as having lucrative contracts generating hundreds of millions of dollars of revenues by sourcing and supplying over 20 million phones to 9.2 million farmers.

55.     In reality, Tingo was non-operating and dormant.

56.     In February 2020, Dozy orchestrated a share exchange through which Tingo International Holdings ("TIH") which Dozy controlled became Tingo's Mobile sole shareholder with Dozy as TIH's CEO.

15

57.     Dozy pursued a public listing of Tingo Mobile's parent company Tingo International Holdings ("TIH") starting in August 2020 with submission of a listing application to NASDAQ and a confidential draft registration statement to the SEC.

58.     Dozy abandoned those efforts in summer of 2021 and turned his attention to AFH.

**B.      Mmobuosi Sells Tingo Mobile to Agri-Fintech.**

59.     Tingo Mobile became a public company when iWeb, Inc., a public company, issued 928 million shares of its Series A common stock and 65 million shares of its Series B common stock to Dozy acquire all the issued and outstanding common stock of Tingo Mobile from TIH, at a $3.7 billion valuation purportedly supported by phony financial statements certified as, *inter alia*, "fairly presented" by GTN and GTI. The merged company renamed itself Tingo, Inc.—later renamed Agri-Fintech—and made Mmobuosi its CEO, a position he continues to hold to this day. AFH's common stock traded on OTC Link until very recently under the symbol TMNA. This transaction gave Dozy his controlling stake in AFH which he used to defraud Tingo.

60.     Tingo Mobile was Agri-Fintech's sole operating subsidiary from August 2021 through November 2022. During this time, Tingo Mobile's reported results of operations were consolidated into, and comprised the overwhelming majority of bulk of, Agri-Fintech's publicly reported financial and periodic statements. These financial statements were audited and certified by Defendant Gries.

61.     From August 2021, through November 2022, Tingo Mobile's phony financial results were consolidated into AFH's and filed with the SEC. Those financial statements formed the basis of the valuation of Tingo Mobile's sale to Tingo.

C.        **Agri-Fintech Sells Tingo Mobile to Tingo Group.**

62.     On October 6, 2022, AFH and Tingo entered into a merger subject to Tingo shareholder approval with AFH receiving stock that would constitute approximately 77.5% of the equity of Tingo after the merger.

63.     Under the merger agreement, Tingo acquired 100% of Tingo Mobile from AFH in exchange for 19.99% of Tingo's common stock, plus preferred convertible shares that, upon conversion, would give AFH ownership of 77% of MICT's outstanding common shares. (Following the Merger, MICT rebranded itself as Nominal Defendant Tingo Group, Inc., trading on Nasdaq under the symbol "TIO.")

64.     The merger occurred on December 1, 2022 but due to FINRA rules it required a vote of Tingo shareholders.

65.     In connection with the sale of Tingo Mobile to Tingo, AFH received a loan of $23.7 million from Tingo.

66.      Since its sale of Tingo Mobile, AFH has not acquired or developed any operational businesses; it currently operates as a holding company for its equity interests in Tingo, providing AFH shareholders and investors indirect exposure to Tingo stock. On October 6, 2023, AFH announced its intention to liquidate the company and distribute its Tingo holdings to its shareholders upon its conversion of the Tingo preferred shares into Tingo common stock received as a result of the December 2022 merger.

67.     The Adviser Defendants, according to Tingo's early 2023 press release, provided Tingo with advisory services on this acquisition.

**D.**   **Dozy Sells Tingo Food To Tingo**

68.      On February 9, 2023, Tingo acquired from Mmobuosi, all equity in Tingo Foods PLC which had been operating since September 2022. Tingo Food is a Nigerian public limited company operating in the food processing industry.

69.      The purported financial results for Tingo Food were included in Tingo's quarterly financial statements for the quarters ended March 31, 2023 and June 30, 2023 and September 30, 2023.

**E.**   **False Financial Statements For Tingo Mobile Were Used To Defraud Tingo And To Mislead Tingo Shareholders To Vote To Approve Tingo's Acquisition Of Tingo Mobile**

70.      To perpetuate the ruse of a thriving enterprise, Dozy concocted phony bank records purportedly showing billions of dollars in transactions through Tingo Mobile that never appear in legitimate bank statements. Auditor Defendants' failure to detect such blatant and obvious fraud is misfeasance and/or malfeasance.

71.      For example, for the 2021 calendar year, Tingo Mobile's actual statement for its primary operating bank account—which was not even opened until February 2021—shows (a) a N50,000 opening balance (around $120) (b) total debits of around N342 million (about $828,000), (c) total credits of around N344 million (about $833,000), and (d) a closing balance of N1.6 million (less than $4,000).

72.      By contrast, the fictitious bank statement for the same Tingo Mobile account for the 2021 calendar year provided to Agri-Fintech's and Tingo Group's auditors shows (a) an opening balance of nearly N11 billion (around $26.7 million), (b) total debits of around N360 billion (around $872.8 million), (c) total credits of nearly N400 billion (around $969.7 million), and (d) a closing balance of over N53 billion (around $128.5 million).

73.     Similar fictitious bank statements were manufactured by Tingo Mobile to falsify its cash balances to auditors in subsequent reporting periods.

74.     Tingo Mobile also produced and provided its parent company auditors (Gries and later Deloitte) monthly account statements from a fixed deposit account purportedly held at the same bank showing balances from $24,096,933.50 in January 2022 to $489,000,246.56 in March 2023. Documents produced by the bank confirm that there is no—and has never been—a fixed deposit account for Tingo Mobile.

75.     Dozy also prepared or directed the preparation of a fictitious general ledger to support these fabricated bank balances, with journal entries corresponding to the made-up deposits and withdrawals in their forged bank statements, as well as false invoices, remittances and contracts to lend further credibility to its business activities.

76.     Tingo Mobile also produced monthly account statements from a fixed deposit account purportedly held at the same bank showing balances from $24,096,933.50 in January 2022 to $489,000,246.56 in March 2023. Documents produced by the bank procured by the SEC subpoenas confirm that there is not—and has never been—a fixed deposit account for Tingo Mobile.

77.     Dozy also prepared or directed the preparation of a fictitious general ledger to support these fabricated bank balances, with journal entries corresponding to the made-up deposits and withdrawals in their forged bank statements, as well as false invoices, remittances and contracts to lend further credibility to their forged bank statements.

78.     Dozy caused AFH and Tingo to use these bank statements, ledgers, and other forged supporting material in their periodic SEC filings and other communications to falsely depict Tingo Mobile as a thriving business, sourcing millions of mobile handsets from phone

suppliers and re-selling or leasing them to a massive customer base using proprietary, pre-installed Tingo Mobile data packages and applications and generating significant revenues and profits.

79.     From August 2021 through November 2022, AFH incorporated Tingo Mobile's fictitious transactions and results into its books and records and reported these fabricated results in its publicly-disclosed financial statements.  After December 2022, Tingo's audited and unaudited financial statements were included in Tingo's SEC filings and public reports throughout.

80.     The SEC action alleged, based upon its investigation:

- Each financial statement in every periodic report filed by Agri-Fintech covering the period August 2021 through November 2022—including Agri-Fintech's Forms 10-K for the fiscal years 2021 and 2022, and its Forms 10-Q for the third quarter of 2021 and the first, second and third quarters of 2022—overstated the company's revenues, expenses and cash and cash equivalents by 100%.  As Agri-Fintech's CEO, Mmobuosi signed and certified each of the Company's periodic filings during this period, attesting to the material accuracy of the financial statements they presented.

- Defendants Gries, GTI and GTN audited these financial statements or significant portions (subsidiaries ) thereof.

- Christophe Charlier, co-Chair of Agri-Fintech's Board of Directors, refused to approve Agri-Fintech's FY 2022 Form 10-K.  In an April 24, 2023 letter to Mmobuosi—which was also filed with the Commission—Charlier resigned from Agri-Fintech's Board, citing his "numerous efforts to implement best corporate government practices" that had been "unanswered and unheeded."

- Each financial statement in every periodic report filed by Tingo Group covering the period after December 1, 2022—including Tingo Group's Form 10-K for the fiscal 2022, and its Forms 10-Q for the first and second quarters

of 2023—overstated the company's revenues, expenses and cash and cash equivalents by upwards of 90%.

- Defendant Deloitte audited and/or reviewed those financial statements.

- Numerous press releases, earnings conference calls and other company announcements repeated or amplified these falsehoods. For example, in a November 14, 2022 press release issued by Agri-Fintech, Mmobuosi boasted that "our revenues are tracking at almost $1.2 billion per annum," a knowing (or reckless) and material falsehood based on fictitious transactions nowhere reflected in Tingo Mobile's bank statements. Similarly, on Tingo Group's March 31, 2023 earnings call, Mmobuosi touted Tingo Mobile's 9.3 million farmer customer base and Tingo Foods's generation of $400 million in its first four months of existence—both knowing (or reckless) and material falsehoods based solely on these entities fictious set of books. Defendants made myriad, comparable public misstatements throughout the period. (Press releases and other public statements representing, among other things, Tingo Mobile's and/or Tingo Foods's purported operations, customer base and/or reported financial results).

81.   Deloitte's audit report also advised that:

We have audited the accompanying consolidated balance sheet of Tingo Group, Inc. (the "Company") as of December 31, 2022, the related consolidated statements of operations, comprehensive loss, changes in temporary equity and stockholders' equity and cash flows for the year ended December 31, 2022, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022, and the results of its operations and its cash flows for the year ended December 31, 2022, in conformity with accounting principles generally accepted in the United States of America.[2]

82.   These statements, among others, in Deloitte's audit report were materially false and misleading when made because Deloitte did not conduct its audit in accordance with the

---

[2]https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0000854800/000121390023025186/f10k2022_tingogroupinc.htm

standards of the PCAOB. Specifically, Deloitte failed, among other things, to: (1) obtain persuasive and sufficient evidence to provide reasonable assurance that Tingo had contracted with two unnamed farming cooperatives, Tingo generated $128 million in revenue from its mobile handset leasing, call and data segments, Tingo held a Nigerian mobile license, Tingo generated certain revenue from its online food marketplace called "Nwassa," and Tingo's annual financial statements were true and accurate to a reasonable degree.

83.     These statements were also materially false and misleading when made because Tingo did not maintain effective internal control over financial reporting and Deloitte failed to properly assess the risk that a material weakness existed in Tingo's financial reporting as a result. Specifically, Deloitte was required to understand, identify and test those internal controls at Tingo that were in place to prevent, detect and/or correct material misstatements and omissions in Tingo's financial statements.

84.     Deloitte knew or should have known that significant inconsistencies existed between Tingo's financial statement disclosures and other critical information Deloitte obtained. These inconsistencies should have indicated that Tingo's related disclosure controls were not properly designed or operating effectively. Further, in violation of PCAOB AS 2201, An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements, Deloitte failed to appropriately respond to these inconsistences.

85.     As such, and unbeknownst to the investing public, Deloitte's clean audit reports had no reasonable basis.

86.     Nor did the audit report advise that it should not be relied on or require additional diligence, time, and information to comply with the standards of the PCAOB.

87.     Given these omitted disclaimers, Tingo investors and prospective investors relied on this Deloitte audit in making and/or maintaining their investment.

88.     As confirmed by the SEC, this audit report advising the results of the audit as "present fairly, in all material respects, the financial position of the Company as of December 31, 2022" was false, misleading and the product of a failure to conduct the requisite diligence and examination required under auditing standards for public companies.

89.     The SEC found "Deloitte had given the fintech firm a clean, unqualified audit for its 2022 accounts" even though "Tingo had only $50 dollars."[3]

90.     "As per Forbes Africa, Hindenburg also threw a light on Deloitte, a behemoth Big Four accounting firm, who green-lit Tingo's financials, challenging its competence, and perhaps its willingness, to see the truth."[4] "The issues in Tingo's financials are glaring enough that we'd expect they could have been spotted by any semi-conscious finance undergrad with severe vision loss," Hindenburg wrote. "These issues were apparently not glaring enough for the company's auditor, however."[5]

91.     The discrepancy between what Deloitte certified, $461.7 million, and Tingo's actual cash balance of $50 was 'astonishing,' Ed Ketz, an accounting professor at Penn State's Smeal College of Business, told Forbes. "The cash account is the most important balance sheet

---

[3] https://www.timesnownews.com/india/deloittes-audit-practices-in-spotlight-over-tingo-troubles-article-107224239

[4] ABP News Bureau, *Hindenburg Unearthed $470-Million Scam By Nigerian Firm That Auditor Deloitte Failed To Notice: Report* (January 29, 2024) https://news.abplive.com/business/deloitte-failed-to-notice-470-million-scam-by-nigerian-firm-that-hindenburg-unearthed-1660294

[5] Id.

account and one of the easiest to audit," he said. "One wonders how Deloitte Israel could have missed that."[6]

92.     Indeed, having an auditor, like Deloitte, which would or should have had unfettered access to Tingo financial records, receipts, contracts, customers, and business associates or contacts,  providing a clean audit to Tingo Group's 2022 accounts raises strong concerns and questions as to whether Deloitte was independent, cut corners, and or negligently overlooked numerous red flags that would have otherwise uncovered these fabrications and fraud risks demonstrating that Tingo's annual report and financial statements therein were materially misstated and omitted material information and, therefore, were not presented in conformity with GAAP.

93.     Since February 2023, Tingo Group has consolidated and reported Tingo Foods' fictitious transactions in its publicly-filed financial statements as well.  As a result, because of Mmobuosi's fraudulent misconduct, Tingo Group and Agri-Fintech have knowingly or recklessly made materially false and misleading representations in every periodic report they filed with the Commission, as well as in many other public announcements, for each reporting period in which they controlled these subsidiaries.

F.     **Deloitte Enabled The Fraud At Tingo**

94.     On October 6, 2022, Tingo engaged Brightman Almagor Zohar & Co. Certified Public Accountant or Deloitte Israel, a firm in the Deloitte Global Network Deloitte, as the Company's new independent registered public accounting firm and auditor.

---

[6] *Id.*

95.     Deloitte is the largest professional services network by revenue and number of employees in the world and is considered one of the Big Four accounting firms along with EY, KPMG and PwC.[7]

96.     Deloitte provides audit, consulting, financial advisory, risk advisory, tax, and legal services with approximately 457,000 employees globally, and operates in over 150 countries.[4] In FY 2023, the network earned revenues of $64.9 billion in aggregate.

97.     For 2022, Tingo disclosed that it paid over $1.5 million to its auditors for audit related fees including its annual audit and reviews of quarterly reports.[8]

98.     The Company retained Deloitte after its auditor, Friedman LLC, resigned as the Company's independent registered public accounting firm on October 3, 2022, effective immediately.

99.     Friedman LLC served as the independent registered public accounting firm, for services rendered for fiscal year 2021. BDO Ziv Haft was the independent auditor for the fiscal year 2020.

100.     On March 31, 2023, Deloitte Israel publicly issued a "clean" audit report over which it had ultimate authority with its results for an unqualified audit for Tingo's 2022 accounts stating:

> In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022, and the results of its operations and its cash flows for the year ended December 31, 2022, in conformity with accounting principles generally accepted in the United States of America.

---

[7] Deloitte overtakes PwC as world's biggest accountant" *The Telegraph*. Archived from the original on 11 January 2022. Retrieved 15 April 2017.

[8] PTI, *Deloitte Israel missed a major fraud at Tingo: Hindenburg* (January 30, 2024) https://www.bizzbuzz.news/national/deloitte-israel-missed-a-major-fraud-at-tingo-hindenburg-1286328

101.    Deloitte Israel's March 31, 2023 audit report advised "[w]e conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud."

102.    In doing so, Deloitte Israel repeatedly violated its professional responsibilities, failed in its role of gatekeeper and deceived investors about Tingo's accounting.

**G.      Tingo's Materially False And Misleading Proxy Solicited Shareholder Votes To Approve The Tingo Mobile Acquisition And Other Proposals**

103.    On December 8, 2022, the Company filed the 2022 Proxy Statement with the SEC. Tingo's proxy statement for a shareholder vote in 2022 contained a proposal to approve Tingo's selection by its audit committee of Deloitte to serve as our independent registered public accounting firm for the year ending December 31, 2022.[9]

104.    The 2022 Proxy Statement was solicited by Defendants Mercer, Benton, Scott, and Trippier pursuant to Section 14(a) of the Exchange Act and contained various false and misleading statements and omissions. The 2022 Proxy Statement called for shareholders to approve, *inter alia*, the election of Defendants Mercer, Benton, Scott, and Trippier to the Board and a proposal to increase the number of Company shares eligible to be issued pursuant the Plan by 5,000,000 (the "Plan Proposal"). The misrepresentations and omissions set forth herein were material to shareholders in voting on electing Defendants Mercer, Benton, Scott, and Trippier to the Board and approving the Plan Proposal. Shareholders would not have approved the Plan Proposal or the election of Defendants Mercer, Benton, Scott, and Trippier to the Board had they been informed of the true financial state of the Company and the wrongdoing alleged herein.

---

[9] https://www.sec.gov/Archives/edgar/data/854800/000121390022075563/pre14a1122_mictinc.htm

105.    The purpose of the Plan Proposal was to "continue to be able to attract, retain and motivate executive officers and other employees and certain consultants." The 2022 Proxy Statement further stated that "we believe that equity compensation aligns the interests of our management and other employees with the interests of our stockholders." The 2020 Proxy Statement also noted that "[w]e believe that option grants have been critical in attracting and retaining talented employees and officers, aligning their interests with those of stockholders, and focusing key employees on the long-term growth of our Company." Regarding the Plan Proposal, the 2022 Proxy Statement also stated the following, in relevant part:

> Upon stockholder approval, an additional 5,000,000 shares of common stock will be reserved for issuance under the 2020 Plan, which will enable us to continue to grant equity awards to our officers, employees and consultants at levels determined by the Board to be necessary to attract, retain and motivate the individuals who will be critical to our Company's success in achieving its business objectives and thereby creating greater value for all our stockholders.

106.    With respect to risk oversight, the 2022 Proxy Statement stated the following:

> The Board, including the Audit Committee and Compensation Committee, periodically reviews and assesses the significant risks to the Company. Our management is responsible for the Company's risk management process and the day-to-day supervision and mitigation of risks. These risks include strategic, operational, competitive, financial, legal and regulatory risks. Our Board leadership structure, together with the frequent interaction between our directors and management, assists in this effort. Communication between our Board and practices include matters of material risk inherent in our business.

> The Board plays an active role, as a whole and at the committee level in overseeing the management of the Company's risks. Each of our Board committees is focused on specific risks within their areas of responsibility, but the Board believes that the overall enterprise risk management process is more properly overseen by all of the members of the Board. The Audit Committee is responsible for overseeing the management of financial and accounting risks. The Compensation Committee is responsible for overseeing the management of risks relating to executive compensation plans and arrangements. While each committee is responsible for the evaluation and management of such risks, the entire Board is regularly informed through committee reports. The Board incorporates the insight provided by these reports into its overall risk management analysis.

The Board administers its risk oversight responsibilities through the Chief Executive Officer and the Chief Financial Officer, who, together with management representatives of the relevant functional areas review and assess the operations of the Company as well as operating management's identification, assessment and mitigation of the material risks affecting our operations.

107.    With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated the following:

We have adopted a Code of Business Conduct and Ethics that applies to our directors, executive officers and all of our employees. The Code of Business Conduct and Ethics is available on our website at www.mict-inc.com and we will provide, at no charge, persons with a written copy upon written request made to us.

108.    The 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

109.    The 2022 Proxy Statement was also false and misleading because it failed to disclose that: (1) the Company failed to maintain adequate internal controls; (2) Defendant Mmobuosi had fabricated part of his biography; (3) the Company reported embellished revenue and other accounting metrics that misled investors about the success of the Company; (4) the Company had fabricated claims about its engagement in many of the business activities, such as food processing and mobile technology, that it claimed would be the drivers of future growth; (5) many of the purported contracts the Company disclosed to shareholders did not actually exist and/or were overstated; (6) in light of the above, the Defendants' statements representing that the

28

Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

110.     As a result of Defendants Mercer, Benton, Scott, and Trippier causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, (1) to reelect Defendants Mercer, Benton, Scott, and Trippier to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) to approve the Plan Proposal, thereby authorizing 5,000,000 shares of the Company's common stock to be available for issuance to the Individual Defendants under the Plan.

**H.     May 1, 2023 Proxy Statement**

111.     On May 1, 2023, pursuant to Section 14(a) of the Exchange Act, the Company filed the 2023 Proxy Statement with the SEC, which contained various false and misleading statements and omissions. The 2023 Proxy Statement was solicited by Defendants Mercer, Benton, Scott, Brown, and Trippier and called for shareholders, *inter alia*, (1) to amend the Company's certificate of incorporation and increase the number of authorized shares of the Company's common stock from 425,000,000 to 750,000,000; and (2) to approve the issuance of shares of Common Stock, upon conversion of the Company's Series A Preferred Stock. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the charter amendment and conversion proposal. Shareholders would not have approved the proposals had they been informed of the true financial state of the Company and the wrongdoing alleged herein.

112.     With respect to risk oversight, the 2023 Proxy Statement stated the following:

> The company board is responsible for overseeing the Combined Company's risk management process. The Combined Company Board focuses on the Combined Company's general risk management strategy, the most significant risks facing the

Combined Company, and oversees the implementation of risk mitigation strategies by management. The Combined Company's audit committee will also responsible for discussing the Combined Company's policies with respect to risk assessment and risk management. The Combined Company Board believes its administration of its risk oversight function has not negatively affected the Combined Company Board's leadership structure.

113.    With respect to the Company's Code of Conduct, the 2023 Proxy Statement stated the following:

The Combined Company has a code of ethics that applies to all of its executive officers, directors and employees, including its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions. The code of ethics is available on *www.tingogroup.com*. The Combined Company intends to make any legally required disclosures regarding amendments to, or waivers of, provisions of its code of ethics on its website rather than by filing a Current Report on Form 8-K. The information on any of the Combined Company's websites is deemed not to be incorporated in this proxy statement or to be part of this proxy statement.

114.    The 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

115.    The 2023 Proxy Statement was also materially false and misleading because it failed to disclose that: (1) the Company failed to maintain adequate internal controls; (2) Defendant Mmobuosi had fabricated part of his biography; (3) the Company reported embellished revenue and other accounting metrics that misled investors about the success of the

Company; (4) the Company had fabricated claims about its engagement in many of the business activities, such as food processing and mobile technology, that it claimed would be the drivers of future growth; (5) that many of the purported contracts the Company disclosed to shareholders did not actually exist and/or were overstated; (6) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

116.     The May 2023 Proxy invited shareholders to rely upon materially false and misleading false and misleading statements of Tingo, AFH, Tingo Mobile and Tingo Food.

117.     The May 2023 Proxy stated: the accompanying proxy statement incorporates important business and financial information about Tingo Group, Inc., a Delaware corporation ("Tingo Group") and Tingo, Inc., a Nevada corporation ("TMNA") from other documents that Tingo Group and TMNA have filed with the U.S. Securities and Exchange Commission ("SEC") and that are not contained in and are instead incorporated by reference in the accompanying proxy statement. For a list of documents incorporated by reference in the accompanying proxy statement, see "Where You Can Find More Information."

118.     The May 2023 Proxy further stated: "the SEC allows Tingo Group to "incorporate by reference" in this proxy statement documents that Tingo Group files with the SEC, including certain information required to be included in this proxy statement. This means that Tingo Group can disclose important information to you by referring you to those documents. The information incorporated by reference herein is considered to be a part of this proxy statement, and later information that Tingo Group files with the SEC will update and supersede that information. Tingo Group incorporates by reference the following documents and any documents subsequently filed by it pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act and

31

before the date of the Special meeting (other than, in each case, those documents, or the portions of those documents or exhibits thereto, deemed to be furnished and not filed in accordance with SEC rules). These documents contain important information about Tingo Group's business and financial performance."

119.    The May 2023 Proxy identified the listed documents incorporated by reference into the 2023 Proxy.

(a)    AFH financial statements for 2021 and parts of 2022 audited by Defendant Gris as updated for the 2023 Proxy and dated April 25, 2023;

(b)    Tingo financial statements for 2022 audited by Deloitte Israel and updated for the 2023 Proxy on March 3, 2023

(c)    Tingo Foods financial statements for 2022 audited by Deloitte Israel April 27, 2023 and include Deloitte Israel's auditor opinion for Tingo Foods as follows:

## INDEPENDENT AUDITOR'S REPORT

To the stockholders of Tingo Foods PLC.

### Opinion on the Financial Statements

We have audited the financial statements of Tingo Foods PLC (the "Company"), which comprise the balance sheet as of December 31, 2022, and the related statements of operations, comprehensive income, changes in stockholders' equity, and cash flows for the period from August 11, 2022 (inception) to the year ended December 31, 2022, and the related notes to the financial statements.

In our opinion, the accompanying financial statements present fairly, in all material respects, the financial position of Tingo Foods PLC as of December 31, 2022, and the results of its operations and its cash flows for the period from August 11, 2022 (inception) to the year ended December 31, 2022 in accordance with accounting principles generally accepted in the United States of America.

### Basis for Opinion

We conducted our audit in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the "Auditor's Responsibilities for the Audit of the Financial Statements" section of our report. We are required to be independent

of the Company and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Responsibilities of Management for the Financial Statements**

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for one year after the date that the financial statements are issued.

**Auditor's Responsibilities for the Audit of the Financial Statements**

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with GAAS, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.

F-85

Table of Contents

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, no such opinion is expressed.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control — related matters that we identified during the audit.

**/s/ Brightman Almagor Zohar & Co.**
**Brightman Almagor Zohar & Co.**
**Certified Public Accountants**
**A Firm in the Deloitte Global Network**

Tel Aviv, Israel
April 27, 2023

120.    As a result of Defendants Mercer, Benton, Scott, Brown, and Trippier causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, (1) to amend the Company's certificate of incorporation and increase the number of authorized shares of the Company's common stock from 425,000,000 to 750,000,000; and (2) to approve the issuance of shares of Common Stock, upon conversion of the Company's Series A Preferred Stock.

I.    **Deloitte's Materially Misleading Audit Opinions Inclusion In For Tingo's 2022 Financial Statements And May 2023 Proxy**

121.    As published in its annual report filed March 31, 2023 on form 10-K with the SEC, Deloitte published its audit report dated March 31, 2023 to the shareholders and the Board of Directors of Tingo stating:

## REPORT OF INDEPENDENT REGISTERED
## PUBLIC ACCOUNTING FIRM

To the shareholders and the Board of Directors of Tingo Group, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of Tingo Group, Inc. (the "Company") as of December 31, 2022, the related consolidated statements of operations, comprehensive loss, changes in temporary equity and stockholders' equity and cash flows for the year ended December 31, 2022, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022, and the results of its operations and its cash flows for the year ended December 31, 2022, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the financial

statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

**Determine the Accounting Acquirer and Evaluate the Valuation and Balance Sheet Presentation of the Consideration – Acquisition of Tingo Mobile Ltd – Refer to Note 13 to the Financial Statements**

*Critical Audit Matter Description*

As described in Note 13 to the financial statements, in May 2022 the Company entered into an Agreement and Plan of Merger with Tingo, Inc. On December 1, 2022, Tingo Group, Inc. completed the merger with a total consideration paid by Tingo Group, Inc to the shareholders of Tingo, Inc. by cash, shares of common stock of Tingo Group, Inc. as well as shares of Series A and B Preferred Stock of Tingo Group, Inc. convertible into common stock upon certain conditions as determined in the Agreement and Plan of Merger. As result of the merger, the Company was determined to be the accounting acquirer and started to consolidate Tingo Mobile Ltd. as of December 1, 2022.

Management estimated the fair value of consideration at the acquisition date using the Tingo, Inc.'s market value (Level 2 observable input) at the date of the transaction instead of the market value of the Company in accordance with ASC 820 – "Fair Value Measurement" or ASC 820. Management considered that the market value of Tingo Inc. at that date, better reflects the fair value of the consideration then measuring the fair value of the consideration using the Company own shares as they determine that its share price at the acquisition date may not be representative of fair value. Management also estimated the fair value of the redeemable preferred stock at the acquisition date to be approximately $553 million and recognized it outside of permanent equity. The provisional purchase price allocation included a software intangible asset of $90.1 million, trade names and trademarks intangible asset of $54.5 million, farmer cooperative intangible asset of $24.8 million and goodwill of $ 81.5 million.

The principal considerations for our determination that performing procedures relating to the determination of the accounting acquirer and evaluating the valuation and balance sheet presentation of the consideration in the acquisition of Tingo Mobile Ltd. is a critical audit matter, are: (i) the complexity of the accounting guidance and significant judgement exercised by the Company's management in assessing the accounting treatment of this transaction, specifically, when determining the accounting acquirer and when developing the fair value estimates of the consideration and its presentation in the financial statements, (ii) high degree of auditor judgement, subjectivity, and effort in performing procedures on evaluating management conclusion on the accounting acquirer and evaluating management's significant judgement related to the use of Level 2 observable inputs; and (iii) the audit effort involved the use of professionals with specialized skills and knowledge.

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to the determination of the accounting acquirer and evaluating the valuation and presentation of the consideration in the acquisition of Tingo Mobile Ltd. included the following, among others:

- We read the Agreement and Plan of Merger to identify and assess the relevant terms and conditions to evaluate the appropriateness of management's accounting treatment.

- With the assistance of our technical accounting specialist, we evaluated management's assessment and conclusion that Tingo Group Inc. is the accounting acquirer and will be the one to consolidate Tingo Mobile Ltd. financial statements from the date of the transaction.

- We assessed and evaluated, with the assistance of our fair value specialists, management's market value valuation technique used to determine the fair value of the consideration paid in accordance with ASC 820 and the determination of the category within the fair value hierarchy (categorizes into three levels);

- We assessed and evaluated the appropriateness of management presentation of the consideration as equity and the portion classified outside permanent equity by considering the terms in the Agreement and Plan of Merger; and

- We evaluated the completeness and accuracy of the transaction disclosures based on ASC 805-10-50 "Business Combinations" by comparing management's disclosures to information obtained from our other audit procedures.

/s/ Brightman Almagor Zohar & Co.

**Brightman Almagor Zohar & Co.**
**Certified Public Accountants**
**A Firm in the Deloitte Global Network**

Tel Aviv, Israel
March 31, 2023
We have served as the Company's auditor since 2022.

### J.    <u>Gries' Materially False And Misleading Audit Opinion</u>

To the Board of Directors and Stockholders

Tingo, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying balance sheets of Tingo Mobile, Inc. (the Company), which comprise the balance sheet as of December 31, 2021 and the related statements of Operations, Changes in Stockholder's Equity, and Cash Flows for the years then ended, and the related notes to the financial statements.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United Sates) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we were required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. According we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluation of the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgements. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the disclosures to which it relates.

**Revenue Recognition, Deferred Income, and Costs matching**

*Critical Audit Matter Description*

The Company recognizes revenue upon transfer of control of promised products or services to customers in an amount that reflects the consideration the Company expects to receive in exchange for those products or services. The Company offers customers the ability to purchase cellular phones directly, lease the phones on three year terms, and purchase data and calls, as well as use of the NWASSA platform. As part of these contracts, the Company records Revenue and Cost of sales, and has short term and long term assets and liabilities recorded related to the cost of contracts and the deferred income and taxes receivable, respectively.

Significant judgment is exercised by the Company in determining the accounting policies related to these long term transactions, including the following:

- Determination of whether products and services are considered distinct performance obligations that should be accounted for separately versus together, such as phone leases and purchase of data.
- Determination of stand-alone selling prices for each distinct performance obligation and for products and services that are not sold separately.
- The pattern of delivery (i.e., timing of when revenue is recognized) for each distinct performance obligation.
- Estimation of variable consideration when determining the amount of revenue to recognize (i.e., separate items on NWASSA platform)
- Determination of long term costs and identification of amounts in the current period, ensuring the matching principle is specifically followed.

Given these factors, the related audit effort in evaluation management's judgements in determining revenue recognition and cost recognition for the customer agreements was extensive and required a high degree of auditor judgement.

*How the Critical Audit Matter Was Addressed in the Audit*

Our principal audit procedures related to the Company's revenue recognition for these customer agreements included the following:

- We evaluated management's significant accounting policies related to these customer agreements for reasonableness.
- We selected a sample of customer agreements and performed the following procedures:
    - Obtained and read contract source documents for each selection, including master agreements, and other documents as needed.
    - Tested managements identification of significant terms for completeness, including the identification of distinct performance obligations and variable consideration.
    - Tested costs related to these revenues, ensuring amount recorded in the current period was in line with expectations.
- We recalculated long term portion of deferred income, prepayments, and VAT receivable, ensuring proper classification between short term and long term on the financial statements.
- We evaluated the reasonableness of management's estimate of stand-alone selling prices for products and services that are not sold separately.
- We tested the mathematical accuracy of managements calculations of revenue and the associated timing of revenue recognized and expenses recorded in the financial statements.

**Goodwill**

*Critical Audit Matter Description*

As part of the acquisition of Tingo Mobile, PLC, on August 15, 2021, the Company calculated goodwill related to the purchase of $3.6 billion. The Company tests impairment by either performing a qualitative evaluation or a quantitative test, at least annually, or more frequently if an indication of impairment exists. Managements Quantitative goodwill impairment testing is

performed in the fourth quarter of the fiscal year by comparing the estimated fair value of the associated reporting unit as of December 31 to it carrying value. Fair value is estimated using a discounted cash flow model.

Significant judgment is exercised by the Company in determining the accounting policies related to these goodwill impairment assumptions, including the following:

- Estimated revenue growth rate for the projection period
- Estimation of discount rate based on company equity structure
- Estimation of operating cash flows based on forecasted figures for the impairment model.

Given these factors, the related audit effort in evaluation management's judgements in determining goodwill value was extensive and required a high degree of auditor judgement.

*How the Critical Audit Matter Was Addressed in the Audit*

Our principal audit procedures related to the Company's Goodwill impairment evaluation included the following:

- Reviewed Qualitative items for goodwill impairment, determining if there was a need to perform Quantitative assessment.
- Recalculated the Quantitative assessment of the Goodwill calculation, including a reasonableness test of the discount rate and projected growth rate.
- Reviewing projections to comparable companies, ensuring reasonableness of the rates used.
- Verified no impairment noted based on recalculations performed.

**Emphasis of Matters-Risks and Uncertainties**

The Company is not able to predict the ultimate impact that COVID -19 will have on its business. However, if the current economic conditions continue, the pandemic could have an adverse impact on the economies and financial markets of many countries, including the geographical area in which the Company plans to operate.

**/s/ Gries & Associates, LLC**

We have served as the Company's auditor since 2021.

Denver, Colorado

March 31, 2022

## K.     Auditor's Duties To Audit Clients

122.     As the external auditors, the Auditor Defendants were required to audit their

respective clients financial statements and the effectiveness of their respective client's internal

controls over financial reporting in accordance with GAAS, promulgated by the American

Institute of Certified Public Accountants ("AICPA"), and the standards of the PCAOB. The

PCAOB, which was established by the Sarbanes-Oxley Act of 2002, adopted GAAS in April 2003. The standards adopted by PCAOB that also have been approved by the SEC are designated with the prefix "AS." Preexisting interim standards that have been adopted by the PCAOB are designated by the prefix "AU." 512. GAAS is comprised of ten standards that fall into three basic categories: General Standards, Fieldwork Standards, and Reporting Standards. These standards are set forth in AU § 150.01-.02. Specifically, the General Standards provide guidance to an auditor on the exercise of due professional care in the performance of the audit. The Standards of Fieldwork provide guidance on audit planning, proper evaluation of internal controls, and the collection of appropriate evidential matter. Finally, the Standards of Reporting provide guidance to the auditor on the content of an audit report.

123.   All of the Auditor Defendants in their respective audit opinions represented "we conducted our audit in accordance with the standards of the PCAOB."

124.   PCAOB standards require, among other things:

### Professional Skepticism

.07   Due professional care requires the auditor to exercise *professional skepticism*. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence.

.08   Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process.

.09   The auditor neither assumes that management is dishonest nor assumes unquestioned honesty. In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest.

### Relevance and Reliability

.07   *Relevance.* The relevance of audit evidence refers to its relationship to the assertion or to the objective of the control being tested. The relevance of audit evidence depends on:

a.  The design of the audit procedure used to test the assertion or control, in particular whether it is designed to (1) test the assertion or control directly and (2) test for understatement or overstatement; and

b.  The timing of the audit procedure used to test the assertion or control.

.08    *Reliability*. The reliability of evidence depends on the nature and source of the evidence and the circumstances under which it is obtained. For example, in general:

▪  Evidence obtained from a knowledgeable source that is independent of the company is more reliable than evidence obtained only from internal company sources.

> Note: *See* Appendix A of this standard for requirements related to the evaluation of evidence from a company's specialist.

▪  The reliability of information generated internally by the company is increased when the company's controls over that information are effective.

▪  Evidence obtained directly by the auditor is more reliable than evidence obtained indirectly.

▪  Evidence provided by original documents is more reliable than evidence provided by photocopies or facsimiles, or documents that have been filmed, digitized, or otherwise converted into electronic form, the reliability of which depends on the controls over the conversion and maintenance of those documents.

Note: If a third party provides evidence to an auditor subject to restrictions, limitations, or disclaimers, the auditor should evaluate the effect of the restrictions, limitations, or disclaimers on the reliability of that evidence.

## Confirmation

.18    A confirmation response represents a particular form of audit evidence obtained by the auditor from a third party in accordance with PCAOB standards.[10]

125.    Auditor Defendants also failed to adhere to AU Section 543 "Parts of Audit Performed by Other Independent Auditors." (SAS No. 1, 543; No. 164).

126.    It is implied in all contracts for the employment of public accountants that the accounting firm will render its services with that degree of skill, care, knowledge and judgment expected from members of that profession in the particular locality, in accordance with accepted professional standards and in good faith.

---

[10] https://pcaobus.org/oversight/standards/auditing-standards/details/AS1105

127.    In general, the objective of an audit of financial statements by an auditor is to express an opinion on the fairness with which the statements present in all material respects the financial condition, results of operations and cash flows in accordance with GAAP.  The opinion is expressed in the auditor's report, which accompanies  the financial statements.

128.    In an audit engagement, the auditor assumes the responsibility of planning and performing the audit to obtain reasonable assurance of whether or not the financial statements are free of material misstatement--regardless of whether the misstatement  has occurred as a result of error or fraud.  The audit is the process that provides the auditor the basis for expressing an opinion on the financial statements.

129.    Auditor Defendants were required to conduct its audits of Tingo's and/or AFH's financial statements in accordance with generally accepted auditing standards ("GAAS").  These standards are promulgated by the AICPA and are issued from time to time in publications known as "Statements on Auditing Standards."   Each statement has a different effective date.  Once each year, the AICPA issues a codification of the then effective SAS entitled "Codification of Statements on Auditing Standards."

130.    GAAS and prevailing standards imposed, inter alia, the following requirements on auditors:

- a duty to exercise due care and professional skepticism while performing its audit.  That is, Deloitte was required to perform its work using reasonable care and diligence, while maintaining an attitude that included a questioning mind and a critical assessment of audit evidence.  AU § 230.

- a duty to plan and perform  the audit to detect material misstatements,  caused by either error or fraud, and those illegal acts having a direct and material impact on the determination of figures recorded in the financial statements and other reports. AU § 110.

43

    • a duty to maintain independence in mental attitude.  AU §

131.    Taken together, these and other standards required Auditor Defendants to assess and analyze critically all material assertions contained in Tingo's and/or AFH financial statements and the attached notes.

132.    These standards also required Auditor Defendants to determine whether or not Tingo's or AFH or Tingo Mobile or Tingo Foods financial statements were stated in accordance with GAAP and, to the extent they were not, Auditors Defendant were required to so state.

**L.    Deloitte USA Has A History Of Lax
        Oversight Over its Correspondent Branches**

133.    Deloitte's Indian affiliate has also been in controversy in the last five years or so.

134.    Its auditing practices came into the limelight after the collapse of indebted infrastructure financier IL&FS Group. This led to investigation by various Indian regulators and agencies including the Serious Fraud Investigation Office and the Ministry of Corporate Affairs.

135.    Deloitte's audit quality was also examined by the National Financial Reporting Authority (NFRA) which found many lapses in the procedure.

136.    Hindenburg noted that the issues in Tingo's financials "are glaring enough that we'd expect they could have been spotted by any semi-conscious finance undergrad with severe vision loss", Hindenburg wrote. "These issues were apparently not glaring enough for the company's auditor, however."

137.    This is not the first recent instance where the international network of firms has faced regulatory issues.

138.    In September 2023, the Public Company Accounting Oversight Board sanctioned Deloitte & Touche S.A.S. for its quality control violations and imposed a $900,000 fine on the Colombian affiliate of the Deloitte global network.

139.    The PCAOB found that Deloitte & Touche's Colombia's system of quality control
failed to provide it with reasonable assurance that audit work would be performed and
documented in accordance with PCAOB standards.

140.    On the other side of the world, Chinese regulators imposed a heavy fine of $30.8
million on Deloitte's Beijing office for its failure to adequately audit a Chinese state-owned asset
management company whose former head was sentenced to death on corruption charges.

141.    The Chinese regulator noted that Deloitte failed to pay close enough attention to
management activities, and that the audit did not meet the requisite standards.

142.    Similarly, the Malaysian audit firm Deloitte PLT agreed to pay Malaysia's
government $80 million to resolve certain claims related to its auditing of accounts of scandal-
linked state fund 1MDB and its unit SRC International from 2011 to 2014. That was when the
Malaysian government and regulators investigated the firm's role in auditing the financial
statements of 1MDB.

143.    In the IL&FS matter, during arguments before the National Company Law
Tribunal and the Bombay High Court, the government alleged that Deloitte's Indian audit firm
auditing the relevant IL&FS entities connived and colluded with a coterie to conceal information
and falsify the books of accounts.

144.    It was alleged that the auditors knowingly did not report the true state of affairs at
IL&FS as they failed to report the negative net owned funds and negative capital to risk asset
ratio of certain IL&FS group entities.

145.    Petitions filed by Deloitte and some of its partners that challenged the SFIO's
investigation report were dismissed by the Supreme Court through a judgment in May 2023,

paving the way for the Mumbai trial court to continue with proceedings arising from the SFIO's criminal complaint.

146.    Reports by the Institute of Chartered Accountants, Reserve Bank of India and the SFIO also noted that the auditor, along with their engagement team did not perform their duties diligently.

147.    The government alleged that despite having knowledge of the impact of funding of default borrowers for principal and interest payments, Deloitte did not report this in the Auditor's Report from FY 2013-14 to 2017-18, leading to non-compliance of section 143(1)(a) of the Companies Act.

148.    The regulators also alleged that Deloitte's firm auditing IL&FS attempted to postpone the provisioning and recognition of NPA by transferring the loans by mere book entry resulting in showing old loans as closed and non-provisioning of new loans.

149.    Two audit quality reports by the NFRA also highlighted the failure of Deloitte in auditing certain IL&FS entities. To be sure, the NFRA is tasked with recommending accounting and auditing policies and standards to be adopted by companies. It also monitors and enforces compliance with accounting and auditing standards while also overseeing the quality of service of the professions associated with ensuring compliance with such standards.

150.    The audit watchdog concluded that Deloitte's audit firms grossly violated the provisions of Section 144 of the Companies Act, 2013. It notes that the audit firm was in serious breach of the Code of Ethics and did not have adequate justification for issuing an audit report. The NFRA notes that failures and violations by the auditor undoubtedly and fatally compromised the independence required from an audit firm.

151.    Similarly the practices relating to independence have been shown to be severely inadequate and not fit for purpose, the NFRA said in its report. As a result of these failures, the NFRA barred the former Deloitte Haskins and Sells LLP chief Udayan Sen from auditing for seven years and imposed a monetary penalty for auditing lapses at Infrastructure Leasing & Financial Services Ltd (IL&FS). The regulator found him guilty of professional misconduct and not maintaining independence and quality in auditing accounts of the financial company. The findings by regulators and NFRA have been challenged by Deloitte and its partners before various forums.

**M.    E&Y And GTR And GTI Malfeasance And Misfeasance In Connection With Tingo's Acquisition Of Tingo Mobile**

152.    Tingo disclosed in 2023 that it had hired, *inter alia*, Ernst & Young as consultants and/or advisors to perform "due diligence and analysis" of Tingo Mobile. E&Y was negligent in failing to ascertain and/or warn Tingo about the fraud at Tingo Mobile and/or risk of fraud.

153.    Tingo disclosed in 2023 that in connection with the acquisition of Tingo Mobile it had the "opportunity to engage Grant Thornton to undertake an audit and Sarbanes Oxley review of the group's internal control and procedures.

154.    May 9, 2023, To the Stockholders and the Board of Directors of TINGO, INC.:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of Tingo Mobile Plc, a wholly owned subsidiary of Tingo Inc. (the "Company") as of December 31, 2020, and the related consolidated statements of comprehensive profit, stockholders' gain and cash flows for the year then ended, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020, and the results of its operations and its cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

OLAYINKA OYEBOLA & CO.
    (Chartered Accountants)
    We have served as the Company's auditor since February 2020.
    November   , 2022
    Lagos, Nigeria

### N.    Mmobousi Self-Dealing

155.    By crafting the false narrative of Tingo Mobile's and Tingo Foods' success through false financial statements and forged documents, Mmobuosi knowingly or recklessly induced through fraudulent pretenses (i) Agri-Fintech to acquire Tingo Mobile from TIH, a company he controlled, through an all-stock merger in August 2021; (ii) Tingo Group to acquire

Tingo Mobile from Agri-Fintech, a company he controlled, through an all-stock merger in December 2022; and (iii) Tingo Group to acquire Tingo Foods from Mmobuosi personally in February 2023.

156.    Between May and July 2023, Mmobuosi sold over 10 million shares of Agri-Fintech out of an account held in a Swiss bank, reaping over $2 million in proceeds, with almost all of those proceeds pre-dating the Hindenburg report and the consequent depreciation in Agri-Fintech's share price.  Mmobuosi has not filed a Form 4 disclosing these sales. What Forms 4 and Schedules 13D Mmobuosi has filed disclose that he and/or TIH, which he controls, have sold or transferred at least 115 million shares of Agri-Fintech stock valued at close to $226 million since the beginning of 2022, and that Mmobuosi and/or TIH own an additional 839.5 million shares.

157.    Forms 4 and Schedules 13D that Mmobuosi or Agri-Fintech have filed disclose that he or Agri-Fintech, which he controls, have sold at least 12 million shares of Tingo Group stock for $10.4 million between October and November 2023, and that Mmobuosi and/or Agri-Fintech own an additional 39.8 million shares of common stock.

158.    Mmobuosi has also exploited his control status to loot Tingo Group assets (i.e., legacy assets or new revenue from operating subsidiaries of the pre-merger predecessor companies still residing at Tingo Group).  For example, in December 2022, Tingo Group approved a $10 million inter-company loan to Tingo Mobile for "funding costs relating to the purchase of smartphone handsets from its supplier, Bullitt." *Id.* Ex. 123 (Dec. 18, 2022 MICT Board Minutes).

159.    At Mmobuosi's direction, this $10 million was then routed from Tingo Mobile to Mmobuosi personally (or to other individuals for his benefit) through an attorney trust account

on the basis that Mmobuosi had purportedly prepaid Bullitt the $10 million balance out of his own pocket.  Mele Decl. ¶¶ 26, 58; DiBattista Decl. Exs. 124-125, 140; *see also id*. Exs. 93-94 (bank statement and wire transfer record reflecting payments). In fact, Bullitt never received $10 million from any source affiliated with Tingo Mobile.

160.    Additional $16 million has been siphoned from Tingo Group's or its affiliates' accounts and transferred to Mmobuosi's personal accounts with no explanation.

161.    This combined $26 million of misappropriated corporate funds has been used by Mmobuosi for extravagant personal expenses, such as, among other things, the purchase of luxury cars, travel on private jets, a ballroom gala at a five-star hotel in London, and a failed attempt to acquire an English Football Club Premier League team.  Mele Decl. ¶¶ 54–57; DiBattista Decl. Ex. ¶ 141.

162.    Finally, Mmobuosi also fraudulently obtained a two-year promissory note from Tingo Group worth $204 million plus 5% interest per annum as consideration for his sale of Tingo Foods.  The value of the consideration obtained from Tingo Group by Mmobuosi was massively overstated and extracted only through the scheme led by and material misstatements made or caused by Mmobuosi.

O.    **Tingo False And Misleading Statements**

1.    **December 1, 2022 Press Release**

163.    In a press release published December 1, 2022, the same day the Company of the TMNA acquisition, Defendant Mercer stated the following, in relevant part:

> We firmly believe we have acquired one of the world's most exciting Agri-fintech and fintech businesses. ***As reported in Tingo's Q3 results, Tingo Mobile is already highly profitable and growing strongly. Within the past few weeks, Tingo Mobile has delivered a number of major trade deals, which not only are expected to result in a more than tripling of current customer numbers, but also marks the commencement of its global expansion.***

164.    The press release also quoted Defendant Mmobuosi stating "[t]oday's merger is enabling us to accelerate upon our ambitious global expansion strategy, ***which in turn is already beginning to dollarize our business, a trend that is expected to continue and grow throughout 2023 and beyond***." (Emphasis added.)

165.    The statements above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) Tingo Mobile's profitability projections were based on the false representation that it had millions of subscribers; (2) the Company was fabricating its trade deals, as the supposed partners in those deals denied that any agreements existed; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Tingo Mobile had failed to deliver on trade deals and was not highly profitable. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### 2.    March 31, 2023 Form 10-K

166.    On March 31, 2023, the Company filed its annual report on Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 Form 10-K"), which was signed by Defendants Mercer, Chen, Benton, Denos, Trippier, Scott, and Brown. The 2022 Form 10-K stated the following regarding the Company's growth plans for Tingo Foods:

> A key element of the growth plans for Tingo Foods is the development of its own food processing facility. ***To this end, through a joint venture, Tingo Foods has committed to build and operate a state-of-the-art $1.6 billion food processing facility in the Delta State of Nigeria, which is expected to be completed by the end of the first half of 202***4 . . . . In line with its Environmental, Social and Governance ("ESG") commitments, ***Tingo Foods has entered into a partnership with a third party company in the UK, Evtec Energy Plc, who have committed to fund and***

***build a $150 million net zero carbon emission solar plant, to provide a sustainable and low-cost energy source to power its multi-billion-dollar food processing facility.***

167.    The statements made in ¶ 104 above were materially false and misleading because: (1) Tingo foods' purported joint venture partner had no cash on hand and was dormant as of its 2022 annual report; (2) Tingo had not begun preparing the food processing facility site for operations, as was revealed by the fact that no preparation had been completed as of May 24, 2023; and (3) as a result of the foregoing, Tingo was not attempting to build its so-called "state-of-the art" food processing facility

168.    Regarding Tingo Group's globalization strategy, the 2022 Form 10-K stated that "[a]s part of its globalization strategy, TGH and its wholly owned subsidiary, Tingo Mobile Limited ('Tingo Mobile'), have recently begun to expand internationally and entered into trade partnerships that are contracted to increase the number of subscribed farmers from 9.3 million in 2022 to more than 32 million[.]" The 2022 Form 10-K further noted that "[e]ach of TGH's current subscribers is a member of one of a small number of cooperatives with whom a subsidiary of TGH has a contractual relationship, which facilitates the distribution of Tingo-branded smartphones into the various rural communities of user farmers/agri-workers." The 2022 Form 10-K also emphasized that "***[a]s of December 31, 2022, Tingo Mobile had approximately 9.3 million subscribers using its mobile phones and Nwassa payment platform***." (Emphasis.)

169.    The 2022 Form 10-K also contained a discussion of a purported agreement between Tingo Mobile and Airtel, a mobile network provider operating out of Nigeria. In relevant part, the 2022 Form 10-K represented that "[t]hrough a Mobile Virtual Network agreement with Airtel, Tingo Mobile provides its customers in Nigeria with voice and data services."

170.    Regarding TGH's supply of mobile phones, the 2022 Form 10-K stated the following:

> In March 2020, Tingo Mobile entered into a mobile phone procurement contract with UGC Technologies Company Limited, with located in Shenze Town, China. In January 2022, Tingo Mobile entered into an agreement with Bullitt Mobile Limited, based in Reading, England, who are a supplier of branded cellular telephone products and accessories.
>
> ***
>
> ***UGC Technologies Company Limited and Bullitt Mobile Limited are the TGH Group's sole suppliers of mobile phones at present.***
> (Emphasis added.)

171.    The statement above were materially false and/or misleading because they failed to disclose that: (1) the farming cooperatives—Airtel, UGC Technologies Company Limited, and Bullitt Mobile Limited—that Tingo Mobile had claimed resulted in 9.3 million subscriptions had only resulted in a few hundred subscriptions, with many of the farming cooperatives denying having ever heard of or worked with Tingo; and (2) due to the foregoing, Tingo Mobile did not have 9.3 million subscribers and, as such, did not "expect[] 30 million by the end of 2023."

172.    The 2022 Form 10-K represented that Nwassa was "Africa's leading digital agriculture ecosystem." The 2022 Form 10-K further stated the following about how Nwassa operates:

> Tingo Mobile's Nwassa platform is believed to be Africa's leading digital agriculture ecosystem that empowers rural farmers and agri-businesses by using proprietary technology that enables users to access markets in which they operate. ***Using Tingo Mobile's ecosystem, farmers can ship produce from farms throughout Nigeria. The ecosystem provides real-time pricing, straight from the farms, which eliminates middlemen***. The customers of Nwassa users pay for produce bought using available pricing on the platform.

173.    With respect to Nwassa, the 2022 Form 10-K also noted that "the platform processes approximately $1 billion USD in gross transaction value (GTV) on a monthly basis."

53

174.    The statements above were materially false and/or misleading because they failed to disclose that the Nwassa platform does not function. Indeed, the Hindenburg Report revealed that Nwassa's website had been under maintenance for months. Similarly, Hindenburg looked at archives of the platform which show that the platform was never fully developed. Instead, it only listed a few products—none of which had any reviews or ratings. Thus, the revenue numbers are false and misleading because Nwassa being out of operation means that the platform could not have processed the transactions during the time those statements were made.

**3.    March 31, 2023 Press Release and Earnings Call**

175.    Also on March 31, 2023, the Company issued a press release titled "Fintech and Agri-Fintech Company, Tingo Group, Inc., Reports Full Year 2022 Financial Results."

176.    This Press Release stated the following, in relevant part:

MONTVALE, N.J., March 31, 2023 (GLOBE NEWSWIRE) -- Tingo Group, Inc. (NASDAQ: TIO) ("Tingo" or the "Company") today announced its financial results for the fiscal year ended December 31, 2022.

The acquisition of 100% of Tingo Mobile Limited ("Tingo Mobile"), which was completed on November 30, 2022, has resulted in the consolidation of its financial results into the Company from December 1, 2022. Today's earnings presentation and this press release also includes pro forma financial information for the full year ended December 31, 2022, with comparative pro forma financial information for the year ended December 31, 2021, so as to provide shareholders with a fuller understanding of the performance and growth of the acquisition and its expected impact on the Company.

177.    In a section titled "Financial Results," the FY22 Press Release stated the following:

- Tingo Group cash balances at December 31, 2022, amounted to $500.3 million, compared to $96.6 million at December 31, 2021.

- Net revenues of Tingo Group for 2022 (including Tingo Mobile for one month only from December 1, 2022) were $146.0 million, compared to $55.7 million in 2021.

- Pro Forma Consolidated Revenues for 2022 were $1.152 billion, compared to $921.5 million for the prior year, which after stripping out non-recurring mobile handset sales in 2021 of $301.0 million, represented an increase of 85.5%.

- ***Tingo Mobile's Handset Leasing Revenues for 2022 were $476.3 million, up 50.3% on 2021 revenues of $316.9 million.***

- ***Nwassa Agri Fintech platform revenues for 2022 were $532.2 million, up 168.0% on 2021 revenues of $198.6 million.***

- Operating loss of Tingo Group for 2022 (including Tingo Mobile for one month only from December 1, 2022) was $11.8 million, after accounting for nonrecurring transaction expenses of $9.6 million and share based payments of $6.6 million, which if added back would result in an operating profit of $4.3 million, compared to a loss of $37.9 million for 2021.

- Pro Forma Consolidated Operating Income for 2022 was $554.6 million, compared to a loss of $47.0 million in 2021.

- Pro Forma Consolidated EBITDA1 for 2022 was $954.5 million, compared to a Pro Forma Consolidated EBITDA1 of $275.6 million for 2021.

- ***Tingo Mobile increased the customer numbers on its Nwassa Agri Fintech platform to 11.4 million at December 31, 2022, from 9.3 million at September 30, 2022, and handled more than $1 billion of customer transactions in the month of December.***

178.   In a section titled "Operational Milestones," the FY22 Press Release stated the following:

- ***Signed*** major trade partnership with the All-Farmers Association of Nigeria ("AFAN") on October 20, 2022, which launched ahead of schedule on November 16 2022, and ***includes commitment to enroll a minimum of 20 million new customers with Tingo Mobile.***

- Launched operations in Ghana on November 10, 2022, and signed a landmark trade deal with the Kingdom of Ashanti covering major agricultural and cocoa farming region, ***including a commitment to enroll a minimum of 2 million new customers with Tingo Mobile and a target to increase enrollments to more than 4 million.***

- ***Launched global commodity platform and export business on December 12, 2022, in partnership with the Dubai Multi Commodities Centre ("DMCC"),*** the world's no.1 free trade zone, with the aim of generating a substantial increase in sales demand for the crops produced by Tingo Mobile's farmers.

- Launched in Malawi on December 14, 2022, representing a sizeable market in its own right, and also constituting a strategically important base from which to expand into East Africa, including the neighboring countries of Tanzania, Zambia and Mozambique.

- Acquired 100% ownership of Tingo Foods Plc on February 9, 2023, a recently established food processing business with the capacity to offtake large volumes of raw crops from Tingo Mobile's farmers into finished food and beverage products. ***Since its inception in September 2022, Tingo Foods generated more than $400 million of highly profitable revenues during the four months ended December 31, 2022.***

- ***Tingo Foods, through a joint venture, has recently committed to fit-out and operate a $1.6 billion state of the art food processing facility in the Delta State of Nigeria, which is believed to be the largest of its kind on the African continent, and is expected to multiply the company's food processing capacity, as well as expand its range of food and beverage products.***

- ***Launched the TingoPay Super App and a pan-African partnership with Visa on February 14, 2023, which once fully rolled out will offer retail customers an integrated digital Visa card, together with payments services, an e-wallet, and a wide range of value-added services. TingoPay, with Visa, will also offer a full range of merchant services to businesses, including to Tingo Mobile's farmers.***

- Appointed specialist legal counsel and a team of expert advisors in February 2023 to investigate market manipulation and unlawful naked short selling of stock, and take appropriate action to prosecute any parties that have perpetrated illegal activity, and protect the Company from any such action in the future.

- A special dividend plan and share buyback program are being considered as possible means of increasing shareholder value and to address the significant disconnect between the Company's share price and its real value (in line with valuation multiples applied to other comparable Nasdaq listed companies).

179.    Included in the FY22 Press Release were the following statements from

Defendant Mercer:

> "I am delighted with the remarkable transformation that we achieved in 2022. At the beginning of the year, we were faced with the backdrop of huge disruption in our domestic markets of China and Hong Kong, due to widespread Covid lockdown measures, and a significant downturn in the global financial services sector, in response to which we pivoted the Company both geographically and strategically, and acquired a business that is not only growing strongly but is also addressing some of the world's biggest problems, namely food insecurity, financial exclusion and poverty. I feel privileged to be involved with Tingo and have acquired a business whose success is aligned with improving global food supply, and also with helping Africa and other emerging markets to become food sustainable.

"Our focus for much of 2022 was on completing and integrating our acquisition. After completing extensive due diligence and analysis on Tingo Mobile with a first class team of globally renown advisors, including Ernst & Young, Dentons and Houlihan Lokey, before then restructuring the transaction so as to expedite its completion, and improve the terms for our shareholders, we were delighted to close the transaction to combine the companies before year end. ***This has considerably strengthened our balance sheet at December 31, 2022, resulting in gross assets of $1.7 billion, of which more than $0.5 billion is cash on hand***. In addition, by closing the acquisition in 2022, we were able to engage one of the world's leading accounting and audit firms, Deloitte, to audit the combined December 31, 2022, balance sheet and financial statements. It also gave us the opportunity to engage Grant Thornton to undertake an audit and Sarbanes-Oxley review of the group's internal controls and procedures.

"I am also delighted with the progress we made with integrating Tingo Mobile into the group during Q4 2022, and in accelerating the expansion of the various businesses. ***As announced previously, since November 2022 we have signed trade partnerships that are expected to triple Tingo Mobile's customers by the end of 2023, in addition to expanding our operations into three new countries, launching two new businesses, namely Tingo DMCC and TingoPay, and acquired the highly profitable Tingo Foods business. These significant developments, and their impact in terms of closing the end-to-end seed-to-sale ecosystem, puts us into a very strong position for 2023 and beyond.*** "The financial results for Tingo Mobile, and the pro forma consolidated financial information for the group, speak for themselves. ***Highlights in the pro forma income statement include the 200% growth in gross profit in 2022 to $675 million, and a move from a Net Income Before Tax loss of $47 million in 2021 to a Net Income Before Tax surplus of more than $550 million in 2022.***

Additionally, we have experienced material growth during the first quarter of 2023, and we expect such growth to continue and accelerate throughout the remainder of the year and beyond.

"Having successfully integrated Tingo Mobile into the group and completed an audit with a world leading accounting firm, we look forward to finally addressing the significant disconnect in our share price and attract a valuation that is reflective of our consolidated earnings. ***With more than $500 million of cash on our balance sheet, and the launch of the largest food processing plant in Africa set to take place next year, we have an increasing number of options available to us to overcome the share price disconnect.*** As we continue to evaluate and consider all the options, together with our overall strategy for maximizing shareholder value, we will keep the market apprised and I hope to provide a further update in the coming weeks."

180.    Included in the FY22 Press Release were the following statements from

Defendant Mmobuosi:

> "My colleagues and I at Tingo Mobile and Tingo Foods are delighted that we are
> now part of Tingo Group. The completion of the merger on November 30, 2022,
> represented a major milestone in the history of Tingo Mobile, which my father and
> I founded some 22 years ago. We are already seeing the benefits of the synergies
> in the group, and of being part of a Nasdaq listed company, and our shareholders
> will have noted the considerable progress we have made since the fourth quarter of
> 2022, with the acceleration of our growth plans and globalization and dollarization
> strategies.

> "We are particularly excited about the completion of the virtuous circle of our
> agrifintech eco-system, where we can now deliver on, and profit from, every part
> of the journey from seed-to-sale. ***We are also very excited about our
> diversification, both geographically, including within my home continent of
> Africa, as well as into other parts of the world and into other sectors, for
> example, through our B2C and B2B TingoPay business and partnership with
> Visa.***

> "As we deliver on our success for the Company and its shareholders, it is of the
> highest importance to me and the Board of Tingo Group that we equally deliver on
> our mission and our Environment Social and Governance ("ESG") goals, as we
> continue to strive to meaningfully improve global food security and financial
> inclusion, and also to deliver social and financial upliftment to our customers and,
> very importantly to me, help make Africa food sustainable.

> "With the major steps we have taken in recent months to capitalize on our merger
> and the Company's Nasdaq listing, we are confident we can build significantly on
> the revenue and earnings growth we achieved in 2022 and deliver considerable
> value to our shareholders."

181.    In a section titled "2022 Financial Review," the FY22 Press Release stated the

following:

- ***Net revenues for the year ended December 31, 2022, were $146.0 million,
  compared to $55.7 million in the prior year, an increase of 162%. The increase
  is mainly  attributable to the consolidation of Tingo Mobile from December 1,
  2022.***

- Gross profit for the full year 2022 was $64.8 million, or 44% of revenues, compared to
  $9.2 million, or 16% of revenues, in the prior year. ***The increase is mainly attributable to
  the consolidation of Tingo Mobile for the month of December,*** as well as to the growth
  in the margins of the Company's insurance agency business.

- Selling & marketing expenses for the year ended December 31, 2022, were $11.1 million as compared to $6.8 million for the year ended December 31, 2021.
- The increase was due to the consolidation of such costs from Tingo Mobile for the month of December, and an increase in marketing expenses for the Company's insurance businesses, which is offset in part by a decrease in marketing expenses for the stock trading businesses.
- General and administrative expenses were $58.2 million in the full year 2022, compared to $36.5 million in the full year 2021, which is mainly attributed to the consolidation of such costs from Tingo Mobile for the month of December. General and administrative expenses for the year included $9.6 million of nonrecurring transaction expenses and share based payments totaling $6.6 million, representing a decrease in share-based payments of $4.7 million compared to the previous year.
- Operating loss for the for the year ended December 31, 2022, was $11.8 million versus a loss of $37.9 million for the prior year. The decrease in loss from operations is mainly attributable to the consolidation of the profitable operations of Tingo Mobile for the month of December.
- Net loss for the year ended December 31, 2022, was $47.1 million compared to $36.4 million for the year ended December 31, 2021, mainly as a result of an increase in tax expenses relating to the acquisition and consolidation of Tingo Mobile.
- ***As of December 31, 2022, the Company's cash and cash equivalents on a consolidated basis was approximately $500.3 million, compared to $96.6 million at December 31, 2021. This reflects an increase of $403.7 million in cash and cash equivalents, which is attributable to the consolidation of Tingo Mobile's cash balance into the Company.***

182.    The statements above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, Defendants failed to disclose to investors: (1) that Defendant Mmobuosi had lied about his biography and resume; (2) that Tingo photoshopped its logo onto pictures of airplanes the Company did not own; (3) that Tingo fabricated or inflated the margins on its food divisions; (4) that Tingo represented stock images as models of its planned Nigerian food processing facility and exaggerated the progress it had made on constructing the facility; (5) that Tingo overstated its food inventory; (6) that Tingo overstated its relationship with the farming cooperatives it claimed made up the majority of its Tingo Mobile subscribers; (7) that Tingo did not earn $128 million in revenue for its leasing, call and data segments as it had previously claimed; (8) that Tingo Mobile was delinquent on tax obligations in Nigeria; (9) that Tingo

photoshopped its logo onto a competitors point of sale system website and claimed it as its own; (10) that Niassa did not generate $125.3 million in revenue for Tingo; (11) that Tingo's agricultural export business was not set to hit $1.34 billion in exports by the third quarter of 2023; (12) that Tingo lacked adequate financial controls; and (13) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

183.    Also on March 31, 2023, the Company hosted an earnings call to discuss its 2022 Fiscal Year financial results with analysts and investors. During the call, Defendant Mmobuosi represented that "[i]n November and December, we signed trade agreements with two major partners with the aim of *quickly expanding Tingo Mobile's customer base from 9.3 million to an expected 30 million by the end of 2023*."

184.    The statement made above was false and misleading because: (1) the farming cooperatives that Tingo Mobile had claimed resulted in 9.3 million subscriptions had only resulted in a few hundred subscriptions, with many of the farming cooperatives denying having ever heard of or worked with Tingo; and (2) due to the foregoing, Tingo Mobile did not have 9.3 million subscribers and, as such, did not "expect[] 30 million by the end of 2023."

### 4.    May 1, 2023 Form 8-K and Attached Presentation

185.    On May 1, 2023, Defendant Mercer presented to investors at the Taglich Brothers Investment Conference. Following the conference, the Company filed a Form 8-K with the slide deck from the presentation attached. The slide deck stated that "[n]ew state-of-the-art $1.6 billion food processing facility set to multiply capacity and revenue – scheduled to open mid-2024."

186.    The presentation also included a rendering of the proposed facility, pictured below:



187.    The statements above were materially false and misleading because:(1) Tingo foods' purported joint venture partner had no cash on hand and was dormant as of its 2022 annual report; (2) Tingo had not begun preparing the food processing facility site for operations, as was revealed by the fact that no preparation had been completed as of May 24, 2023; and (3) as a result of the foregoing, Tingo was not attempting to build its so-called "state-of-the- art" food processing facility.

188.    The representation above was also materially false and misleading because the rendering of the facility which was included in the slide deck and attached to the Form 8-K was actually a stock photo of an oil refinery that was available for purchase online.

### 5.    May 15, 2023 Form 10-Q

189.    On May 15, 2023, the Company filed a Form 10-Q with the SEC for the first fiscal quarter ended on March 31, 2023 (the "Q1 2023 10-Q), which Defendants Mercer and Chen signed. The Q1 2023 10-Q stated, "***Tingo Foods has also agreed to enter into a partnership with Evtec Energy Plc to build and operate our own food processing facility, which is expected to be completed by mid-2024***." (Emphasis added.)

190.    The statements above were materially false and misleading because: (1) Tingo Foods' purported joint venture partner had no cash on hand and was dormant as of its 2022 annual report; (2) neither Tingo nor its purported joint venture partner had begun preparing the food processing facility site for operations, as was revealed by the fact that no preparation had been completed as of May 24, 2023; and (3) as a result of the foregoing, Tingo's food processing facility was not "expected to be completed by mid-2024."

191.    The Q1 2023 10-Q also reported on Tingo Foods' financial results following its acquisition by Tingo on February 9, 2023. The Q1 2021 10-Q represented that, from February 9, 2023 to March 31, 2023, Tingo Food reported net revenue of $577,219,000. It also reported that Tingo foods' net profits during that same period were $143,445,000.

192.    The statements above were materially false and misleading because Tingo Foods had not generated $577.2 million in revenue or $143.5 million in profits between February 9, 2023, and March 31, 2023. Indeed, during this 50-day period, Tingo did not own its own food processing facility and instead claimed to have outsourced production to unnamed third parties who own processing plants in Nigeria. Moreover, the Q1 2023 10-Q did not report that Tingo Foods had any inventory and, as a result, Tingo's financial reports contained a variety of errors begging the question as to whether the Company had any financial controls.

193.    The Q1 2023 10-Q also reported that the Company had $780,153,000 in cash and cash equivalents, further noting that "***the majority of the cash is held at its bank in Nigeria***, and there are certain foreign exchange restrictions in place that limit the conversion of such cash into US Dollars and other currencies." (Emphasis added.)

194.    The statements above were materially false and misleading because, based on Tingo's financial statements, it would be impossible for the Company to have over $780 million

in cash. Indeed, as the Hindenburg Report reveals, if Tingo's cash claims were true, its interest income for the first quarter of 2023 would have been approximately $12 million using Nigeria's market interest rate of 8% for deposits. And yet, Tingo reported just $1,444,000 in financial income for the first quarter of 2023, thereby indicating that the Company did not have over $780 million in cash as of the date the Q1 2023 10-Q was filed.

**6.  May 15, 2023 Form 8-K**

195.    Also on May 15, 2023, the Company filed a Form 8-K with the SEC to announce its quarterly earnings, which Defendant Mercer signed. Attached to the 8-K was a press release titled "Tingo Group, Inc. Reports First Quarter 2023 Financial Results." The press release, stated in relevant part:

> Tingo Foods, together with its joint venture construction partner on the new state of- the-art $1.6 billion food processing facility, celebrated the breaking of ground\ with a foundation laying ceremony attended by various representatives of local government and Nigeria's Ministry of Agriculture. ***Since then, significant progress has been made on the construction of the facility including the installation of infrastructure, drainage, water supply and the foundations of its numerous buildings. With construction work progressing as scheduled,*** the new food processing facility, to be operated exclusively by Tingo Foods is on timetable and anticipated to open by mid-2024.

(Emphasis added.)

196.    Also on May 15, 2023, the Company filed a Form 8-K with the SEC to announce its quarterly earnings, which Defendant Mercer signed. Attached to the 8-K was a press release titled "Tingo Group, Inc. Reports First Quarter 2023 Financial Results." The press release, stated in relevant part:

> Tingo Foods, together with its joint venture construction partner on the new state-of-the-art $1.6 billion food processing facility, celebrated the breaking of ground with a foundation laying ceremony attended by various representatives of local government and Nigeria's Ministry of Agriculture. ***Since then, significant progress has been made on the construction of the facility including the installation of infrastructure, drainage, water supply and the foundations of its numerous***

*buildings. With construction work progressing as scheduled,* the new food processing facility, to be operated exclusively by Tingo Foods is on timetable and anticipated to open by mid-2024.

    (Emphasis added.)

## 7.    May 15, 2023 Earnings Conference Call

197.    Later on May 15, 2023, Tingo held an earnings conference call with investors to discuss the first quarter financial results for 2023. During that call, Defendant Mmobuosi stated that "Tingo Foods is set to multiply capacity and revenue with a new state-of-the-art $1.6 billion food processing facility in Delta State of Nigeria. ***Our joint venture partner is already at an advanced stage of completing work on the building's foundations and the installation of infrastructure, drainage, and water supply and facility is on track to open by mid-2024.***" (Emphasis added.)

198.    The statements above were materially false and misleading because: (1) Tingo foods' purported joint venture partner had no cash on hand and was dormant as of its 2022 annual report; (2) neither Tingo nor its purported joint venture partner had begun preparing the food processing facility site for operations, as was revealed by the fact that no preparation had been completed as of May 24, 2023; and (3) as a result of the foregoing, Tingo's food processing facility was not "expected to be completed by mid-2024."

199.    Defendant Mmobuosi further stated on the call that "***Within the first four months of trading to December 31, 2022, Tingo Foods generated more than $466.2 million of turnover. The first quarter of 2023 then saw revenues grew to $577.2 million, generating an operating profit of USD143.5 million***." (Emphasis added.

200.    The statements above were false and misleading because Tingo Foods had not generated $577.2 million in revenue or $143.5 million in profits between February 9, 2023, and

64

March 31, 2023. Indeed, during this 50-day period, Tingo did not own its own food processing facility and instead claimed to have outsourced production to unnamed third parties who own processing plants in Nigeria.

201.    Also during the call, Defendant Chen reported "Nwassa platform revenues of $125.3 million" for the first quarter of 2023. This figure was also listed in the slide deck which accompanied the call.

202.    The statements above were false and misleading because the Nwassa platform does not function. Indeed, the Hindenburg Report revealed that Nwassa's website had been under maintenance for months. Similarly, Hindenburg looked at archives of the platform which show that the platform was never fully developed. Instead, it only listed a few products— none of which had any reviews or ratings. Thus, the revenue numbers are false and misleading because Nwassa being out of operation means that the platform could not have processed the transactions during the time those statements were made.

**8.    May 30, 2023 Press Release**

203.    On May 30, 2023, the Company issued a press release which announced that Tingo DMCC "has completed its first batch of export deals, generating $348 million of sales with a gross profit approaching $100 million." The press release further represented that "[t]he sales completed today are part of an anticipated long-term multi-billion-dollar pipeline of export transactions, *more than $1 billion of which are currently being processed for expected delivery by the third quarter of 2023*." (Emphasis added.)

204.    The statements above were false and misleading because Tingo had either fabricated or inflated the export data it reported. The Hindenburg Report revealed that Nigerian customs data has no records of either Tingo or Tingo DMCC exports, yet Tingo claims to have

exported over $348 million. Furthermore, Tingo claims to process more than $1 billion in export transactions, yet Nigeria's entire total agricultural exports in 2022 were $1.15 billion.

      **P.**      **<u>Hindenburg Research Report</u>**

      205.    On June 6, 2023, Wall Street short seller Hindenburg issued a report titled "Tingo Group: Fake Farmers, Phones, and Financials —The Nigerian Empire That Isn't," alleging that Tingo had fabricated its business operations and financials. According to the Hindenburg Report, Tingo made false statements about the success of various subsidiaries, including Tingo Foods, Tingo Mobile, Nwassa, and Tingo DMCC.

      206.    The Hindenburg Report began by describing the Company and the Hindenburg Report's findings, stating:

- We are short Tingo Group Inc (NASDAQ: TIO) because we believe the company is an exceptionally obvious scam with completely fabricated financials.

- Tingo, headquartered in New Jersey, claims to have several business segments focused on providing mobile phones, food processing and an online food marketplace for farmers primarily located in Nigeria.

      207.    Regarding Defendant Mmobuosi's fabricated biography, the Hindenburg Report stated, in relevant part:

- Tingo was founded and is spearheaded by "Dozy" Mmobuosi, CEO of the key holding company entity. Dozy is regularly described by the media as a billionaire and made waves earlier this year when he attempted to acquire the now- Premier League soccer team Sheffield United.

- We've identified major red flags with Dozy's background. For starters, he appears to have fabricated his biographical claim to have developed the first mobile payment app in Nigeria. We contacted the app's actual creator, who called Dozy's claims "a pure lie".

- Dozy claimed to have received a PhD in rural advancement from a Malaysian university in 2007. We contacted the school to verify the degree. They wrote back saying no one by his name was found in their verification system.

- In 2017, Dozy was arrested and faced an 8-count indictment over issuance of bad checks, according to the Nigerian Economic and Financial Crimes Commission. He later settled the case in arbitration.

- In 2019, Dozy claimed to have launched "Tingo Airlines" and posted social media messages encouraging customers to "fly with Tingo Airlines today". Media outlets later uncovered that Tingo had photoshopped its logo onto pictures of airplanes. Dozy later admitted to never owning any actual aircraft.

208.    The Hindenburg Report also pointed out that in April 2023, Christophe Charlie,

the co-chairman of the subsidiary Tingo Inc., filed a public letter with the SEC addressed to

Dozy, stating:

> I have made numerous efforts to implement best corporate governance practices and have always been guided by the best interests of Tingo Inc's shareholders. ***Despite my efforts there remains a lack of communication and teamwork in the management of the company, and many critical questions, comments and recommendations which I have sent to management and the Board have once again remained unanswered and unheeded.*** As a result, I will not be in a position to approve the 10K for 2022 prepared by management and feel it necessary to recuse myself by resigning from the Board.

> (Emphasis added.)

209.    Regarding Tingo foods' financials, the Hindenburg Report revealed overinflated

financials, stating in relevant part:

- Tingo's food division is 7 months old yet claimed to generate $577.2 million in revenue last quarter alone, representing 68% of total reported revenue. If accurate, its claimed 24.8% operating margins would exceed those of every major comparable food company.

- Yet, Tingo has no food processing facility of its own. Rather, it claims its explosive revenue and profitability is derived from

acting as a middleman between Nigerian farmers and an unnamed third-party food processor.

210.   Regarding Tingo's claim it had begun to develop the $1.6 billion state-of-the-art

food processing center, the Hindenburg Report revealed that no progress had even begun, stating:

- In February 2023, the company held a groundbreaking ceremony for a planned $1.6 billion Nigerian food processing facility of its own, attended by the country's agriculture minister and other political luminaries.
- We found that the rendering of the planned facility, featured in Tingo's investor materials and on a billboard at the ceremony, is actually a rendering of an oil refinery from a stock photo website.
- Following its groundbreaking, Tingo reported in a May 2023 SEC filing that it made "significant progress" on the facility, including laying "the foundations of its numerous buildings".
- We visited the site a week later and found zero signs of progress; it was empty except for the plaque and billboard commemorating the groundbreaking ceremony, surrounded by weeds.
- Subsequent to the "groundbreaking", Tingo announced a $150 million agreement with a UK entity called Evtec Energy to build solar panels for its non- existent food processing facility. Funding for the deal is slated to be provided through Evtec, but UK filings show that Evtec was "Dormant" as of its most recent annual report and held zero cash in the bank.
- Tingo Group bought Tingo Foods from Dozy in February 2023 for $204 million, a price "approximately equal to the cost value of the inventory held by Tingo Foods".
- The inventory, which was reported in year-end financials, completely vanished from Tingo's Q1 2023 accounts without explanation. In our experience, $204 million in inventory doesn't just disappear at companies with adequate internal controls and genuine financial reporting.

211.   Regarding the Company's claims that Tingo Mobile was a financial success, the

Hindenburg Report revealed the following:

- Tingo claimed in its reverse merger press release that members of 2 unnamed farming cooperatives supply the majority of its then-9.3 million userbase, consisting of local Nigerian farmers. These farmers supposedly form the core of the company's phone customers and provide the agricultural products used in

Tingo's food processing and trading businesses

- A local media outlet identified and contacted the cooperatives. Both said they had never heard of Tingo and had fewer than 100 farmers in each cooperative.

- We were able to make contact with one of the cooperatives. Its owner reiterated having no relationship with Tingo and flat out told us "they are scammers."

- Tingo claimed its mobile handset leasing, call and data segments generated $128 million in revenue last quarter (~15% of total), claiming these services are provided through an agreement with Airtel in Nigeria. The type of license they claim did not exist until June 2023.

- Our checks with the Nigerian Communications Commission showed it has no record of Tingo being a mobile licensee at all, despite company claims of having 12 million mobile customers.

- Despite claiming to have millions of farmers using its phones, Tingo Mobile's corporate presentation and webpage uses stock photos of farmers using phones.

- We visited Tingo Mobile's office in Nigeria and found only a handful of employees and a sign posted on its door by federal tax authorities stating that the company is delinquent on its tax obligations.

- Tingo Mobile claimed a Ghana expansion effort would enroll 2-4 million members by February 2023. This would represent ~9%-18% market share in the country within months of launch. We found zero records pertaining to Tingo Mobile through Ghana's communication regulator.

- We tried to contact Tingo's Ghana support in late May to buy a phone. The email bounced back and no one picked up the phone despite numerous attempts.

- We visited Tingo's Ghana office location in late May 2023. We saw 2 cars in the parking lot and no customers. When we tried to enroll in a plan and buy a phone we were told the location wasn't operational yet.

212.    Regarding the Company's claims it had a deal with Visa, the Hindenburg Report

revealed the following:

- TingoPay (part of Tingo Mobile) claimed in 2021 to have launched a partnership with a major local bank.

- Two days after Tingo's blockbuster announcement, the bank put out a statement calling Tingo's claim false and that it had "NOT concluded any agreement with Tingo International in respect of any payment system whatsoever."

213.    Regarding the Company's claim that Nwassa was successful, the Hindenburg

Report revealed the following:

- Tingo now claims its payment group has a point of sale (PoS) system and other merchant products. We found that pictures of Tingo's claimed PoS system were taken from a different PoS operator's website, with a Tingo logo photoshopped over them.
- Tingo claims its "seed to sale" online marketplace called NWASSA generated $125.3 million in revenue last quarter or ~15% of its total revenue, yet the website has been "under maintenance" and inoperable for months.
- Tingo claims it has launched its NWASSA platform in Ghana. The Ghana website also doesn't work and just says "Updating…" without ever going anywhere.

214.    Regarding the Company's claim that Tingo DMCC was a thriving export

business, the Hindenburg Report revealed that its financials were fabricated, stating:

- In a May 2023 press release, Tingo claimed its brand-new agricultural export business, Tingo DMCC, was on track to deliver over U.S. $1.34 billion in exports by Q3.
- Tingo's sales projections for that business are higher than the entire nation of Nigeria's annual 2022 agricultural exports, which totaled about U.S. $1.15 billion, per government data.
- Despite Tingo's bold claims, we found no import/export records from Tingo at all through searches of Nigerian customs and trading databases.
- Tingo DMCC's website has numerous non-functioning links and includes a fake testimonial that appears leftover from the website template.

215.    Regarding the financial controls and quality of the Company's financial reporting,

the Hindenburg Report revealed that its public disclosures were littered with errors, stating the

following:

- Tingo's financial statements are riddled with errors and typos, including a note to itself that it apparently forgot to delete, saying "please update for the tingle (sic) transaction including the tingle (sic) foods transaction".
- Its financials include other basic errors like incorrect math and leaving zeroes off key metrics.

- More troublingly, Tingo's cash flow and balance sheet statements do not reconcile and show major errors indicating a complete lack of financial controls. Its cash flow statements regularly subtract items from cash that should be added and vice versa.
- The errors also seem to apply to Tingo's audited annual financial statements, which were recently given an unqualified audit opinion by Deloitte Israel (a strange choice given the company lacks substantive operations in Israel).
- We strongly suspect Tingo's cash balance, which it conveniently claims is held in Nigeria, is fake. The company collected only ~12% of the interest income one would expect from its claimed cash balances.

216.   Following the allegations, the Hindenburg Report left a scathing conclusion against Tingo, stating "***Tingo is a worthless and brazen fraud that should serve as a humiliating embarrassment for all involved. We do not expect the company will be long for this world***." (Emphasis added.)

217.   On this news, Tingo's stock price fell from a closing price of $2.55 per share on June 5, 2023, to a closing price of $1.32 per share on June 6, 2023.

**Q.   <u>Subsequent Developments</u>**

218.   Following the revelations of the Hindenburg Report, the Company was slow to publicly respond to the allegations.

219.   On June 6, 2023, the Company published a press release "refuting" the allegations in the Hindenburg Report, in which it stated that the report contained "numerous errors of fact" and was "misleading and libelous."

220.   Two days later, on June 8, 2023, the Company appointed outside counsel from White & Case LLP to "conduct an independent review reporting to its independent directors concerning allegations contained in" the Hindenburg Report.

221.    On August 9, 2023, the Company announced it was rescheduling its Second Quarter 2023 Results Conference Call and its 10-Q filing. The Company delayed filing its second quarter 2023 10-Q two more times until it finally filed the 10-Q on August 31, 2023.

### 1.    August 31, 2023 Hindenburg Updated Allegations

222.    On August 31, 2023, Hindenburg published an update (the "Hindenburg Update") on its allegations against Tingo. It noted that Tingo failed to mention any continuing relationship with White & Case LLP after publicly announcing the relationship on June 8, 2023. Instead, Tingo's investigation was now "based on the Company's outside counsel's investigation and further investigative work of its own." White & Case LLP reportedly ended its relationship with Tingo back in July, which the Company failed to and continues to fail to disclose to investors.

223.    Additionally, the Hindenburg Update noted that Tingo failed to name which bank reviewed the Company's errant financial statements and holds the Company's alleged $780 million cash balance.

224.    Likewise, the Hindenburg Update noted that the Company's 10-Q for the second quarter of 2023 revealed the Company's reported cash had "dropped by a stunning $725 million over the course of one quarter."

225.    The Company has not disclosed a plausible explanation for this considerable overnight cash calamity.

226.    On this news, the Company's stock price dropped from a closing price of $1.40 per share on August 30, 2023 to a closing price of $1.29 per share on August 31, 2023. The Company's stock price continued to drop over the next week and sank following further allegations from Hindenburg on September 5, 2023. By September 7, 2023, the Company's stock

price had dropped to $1.09 per share at the closing of trade. This represented a drop of $0.31 per share or 22% in lost value.

### 2. **Board Changes**

227.    On September 18, 2023, Tingo announced changes to its Board and executive leadership. The Company announced that Defendant Mercer stepped down as CEO, and Defendants Mmobuosi and Denos were appointed as Interim co-CEOs. Additionally, Defendant Benton stepped down as a member of the Board and Chair of the Audit Committee. Defendant Benton was replaced by director Jamie Khurshid.

228.    On December 22, 2023, the Company announced that Jamie Khurshid tendered his resignation as a member of the board of directors, effective immediately. Having only been appointed to the Company's Board on September 18, 2023, Jamie Khurshid resigned pending the defense of the complaint made by the SEC on December 18, 2023.[11]

## V.   **DAMAGES TO TINGO**

229.    As a direct and proximate result of the Individual Defendants' conduct, Tingo has lost and will continue to lose and expend many millions of dollars.

230.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

231.    As a direct and proximate result of the Individual Defendants' conduct, Tingo has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

---

[11]https://www.streetinsider.com/Board+Changes/Tingo+Group+%28TIO%29+Announces+Resignation+of+Jamie+Khurshid+from+Board/22570526.html

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## VI.      DERIVATIVE ALLEGATIONS

232.    Plaintiff brings this action derivatively and for the benefit of Tingo to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Tingo, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Section 14(a) Exchange Act and the aiding and abetting thereof.

233.    Tingo is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

234.    Plaintiff is, and has been at all relevant times, a shareholder of Tingo. Plaintiff will adequately and fairly represent the interests of Tingo in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## VII.      DEMAND FUTILITY ALLEGATIONS

235.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

236.    A pre-suit demand on the Board of Tingo is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following three individuals: Defendants Denos, Scott, and Trippier (the "Director Defendants") (together with the Director Defendants, the "Directors").

237.    Plaintiff needs only to allege demand futility as to two of the three Directors.

238.     Demand is excused as to all three of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

239.     All three served on the board as directors while the fraud as alleged herein was being perpetuated and knew or should have known that Tingo misrepresented its revenue, balance sheet, customers, business model, government licenses, and other fundamental corporate accounting figures.

240.     The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors thereby increasing the director defendants ability to earn higher compensation as board members from stock awards and annual salaries.

241.     The Director Defendants also failed to implement or consider implementing the requisite internal controls to prevent or detect the fraud described herein.

242.     As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused. contained false and misleading statements.

243.     Demand on Defendant Denos is futile because he currently serves as interim co-CEO of the Company and has served as a Company director since November 2022. Additionally, Defendant Denos served as Executive Vice President, General Counsel, and Corporate Secretary of TMNA, the previous parent company of Tingo Mobile. Thus, the Company provides Defendant Denos with his principal occupation and, as the Company admits, he is a non-

independent director. Defendant Denos has received and continues to receive compensation for his role as Company director and interim co-CEO. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Denos signed the 2022 Form 10-K, which contained false and misleading statements. For these reasons, Defendant Denos breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

244.     Additional reasons that demand on Defendant Scott is futile follow. Defendant Scott has served as a Company director since November 2019. Defendant Scott also serves as Chairman of the Board, Chair of the Compensation Committee, Chair of the Nominating and Corporate Governance Committee, and a member of the Audit Committee. Additionally, Defendant Scott has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director and the Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

245.     Likewise, the Company lists Defendant Scott as a "financial expert," yet under his watch and expertise, the Company published incorrect and errant financial statements and accounting figures. Furthermore, Defendant Scott signed the 2022 Form 10-K and solicited the 2022 and 2023 Proxy Statements, all of which contained false and misleading statements. The

false and misleading 2022 Proxy Statement also resulted in shareholders voting to reelect Defendant Scott to the Board. For these reasons, Defendant Scott breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

246.     Defendant Trippier has served as a Company director since May 17, 2022. Defendant Trippier also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee and the Compensation Committee. Additionally, Defendant Trippier has received and continues to receive lucrative compensation for his role as a director as described above. As a Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Trippier signed the 2022 Form 10-K and solicited the 2022 and 2023 Proxy Statements, all of which contained false and misleading statements. The false and misleading 2022 Proxy Statement also resulted in shareholders voting to reelect Defendant Trippier to the Board. For these reasons, Defendant Trippier breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

247.     Demand on Defendant Denos is also futile because his appointment as a director stems from the Company's merger agreement with TMNA, of which Defendant Mmobuosi was the CEO. TMNA holds 20% of the shares of Tingo. Pursuant to the merger agreement, TMNA was authorized to appoint two directors to Tingo's Board, one of whom Defendant Denos. The majority of the materially false statements and omissions alleged herein were directly link to now

interim co-CEO Defendant Mmobuosi, who appointed him to the Board. Since Defendant Denos served on the Board pursuant to his appointment by Defendant Mmobuosi, he is beholden to him. Because taking action against the Individual Defendants would potentially harm the financial interests of Defendant Mmobuosi, whom Defendant Denos is beholden to, demand is futile against Defendants Denos.

248.    Demand on Defendants Denos, Trippier and Scott is also futile because they will benefit in the future from the Individual Defendants' solicitation of the 2022 Proxy Statement which called for shareholder approval of the Plan Proposal. The Plan Proposal called for a shareholder vote to increase the number of shares to be issued pursuant to the Plan by 5,000,000, thereby allowing the Individual Defendants to continue to be able to receive payments under the Plan in the future. Shareholders would not have approved the Plan Proposal had they known the true state of affairs at the Company. As a result, Defendants Denos, Trippier, and Scott cannot be presumed to be disinterested in taking action against those who solicited the materially false and misleading 2022 Proxy Statement (i.e. Defendants Mercer, Benton, Scott, and Trippier). As such, demand upon Defendants Denos, Trippier, and Scott is futile and, therefore, excused.

249.    Defendants Scott and Trippier served as members of the Compensation Committee (the "Compensation Committee Directors") during the Relevant Period. The Compensation Committee Directors solicited shareholder approval of the Plan Proposal, which granted them the right to continue to determine how many shares of Company common stock to administer under the Plan to non-employee directors, including themselves. They all stood to benefit in the future from shareholder approval of the Plan Proposal, which allowed for more Company shares to be issued to officers and directors pursuant to the Plan and which Company shareholders were deceived into approving while the Individual Defendants made false and

misleading statements. Thus, Defendant Denos is beholden to the Compensation Committee Directors, and the Compensation Committee Directors are beholden to each other, because they would not take action against the very directors who hold the authority to award them high compensation pursuant to the Plan. These conflicts of interest preclude the Compensation Committee Directors and the rest of the Director Defendants from calling into question the Director Defendants and other Individual Defendants' conduct. Thus, demand upon the Compensation Committee Directors would be futile.

250.    Defendants Scott and Trippier served as members of the Audit Committee during the Relevant Period. In violation of the Audit and Risk Committee Charter, the Defendants Scott and Trippier failed to adequately review and discuss the Company's Forms 10- K; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Scott and Trippier further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

251.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of

Conduct and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

252.    Tingo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Tingo any part of the damages Tingo suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

253.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).

254.    As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

255.    The acts complained of herein constitute violations of fiduciary duties owed by Tingo's officers and directors, and these acts are incapable of ratification.

256.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Tingo. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate

coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Tingo, there would be no directors' and officers' insurance protection.  Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

257.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Tingo to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

258.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CAUSE OF ACTION

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

259.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

260.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

261.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

262.    Under the direction and watch of Defendants Mercer, Benton, Scott, and Trippier, the 2022 Proxy Statement further failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate internal controls; (2) Defendant Mmobuosi had fabricated part of his biography; (3) the Company reported embellished revenue and other accounting metrics that misled investors about the success of the Company; (4) the Company had fabricated claims about its engagement in many of the business activities, such as food processing and mobile technology, that it claimed would be the drivers of future growth; (5) that many of the purported contracts the Company disclosed to shareholders did not actually exist and/or were overstated; (6) in light of the above, the Defendants' statements in support and recommendation to shareholders to vote for all proposals on the ballot were materially misleading and/or lacked a reasonable basis at all relevant times.

263.    Defendants Mercer, Benton, Scott, and Trippier knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for

shareholder determination in the 2022 Proxy Statement, including but not limited to, the re-election of directors.

264.    The false and misleading elements of the 2022 Proxy Statement led Company shareholders to, *inter alia*: (1) re-elect Defendants Mercer, Benton, Scott, and Trippier to the Board, allowing them to continue breaching their fiduciary duties to the Company; and (2) approve an additional 5,000,000 shares of common stock for issuance under the Plan.

265.    Under the direction and watch of Defendants Mercer, Benton, Scott, Brown, and Trippier, the 2023 Proxy Statement failed to disclose that the Company's new subsidiaries were not achieving the level of success that had been purported. The 2023 Proxy Statement further failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate internal controls; (2) Defendant Mmobuosi had fabricated part of his biography; (3) the Company reported embellished revenue and other accounting metrics that misled investors about the success of the Company; (4) the Company had fabricated claims about its engagement in many of the business activities, such as food processing and mobile technology, that it claimed would be the drivers of future growth; (5) that many of the purported contracts the Company disclosed to shareholders did not actually exist and/or were overstated; (6) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

266.    Defendants Mercer, Benton, Scott, Brown, and Trippier knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement. The false and misleading elements of the

2023 Proxy Statement led Company shareholders to, *inter alia*, (1) amend the Company's certificate of incorporation and increase the number of authorized shares of the Company's common stock from 425,000,000 to 750,000,000 and (2) approve the issuance of shares of Common Stock, upon conversion of the Company's Series A Preferred Stock.

267.     The Company was damaged as a result of Defendants Mercer, Benton, Scott, and Trippier's material misrepresentations and omissions in the 2022 Proxy Statement.

268.     The Company was damaged as a result of Defendants Mercer, Benton, Scott, Brown, and Trippier's material misrepresentations and omissions in the 2023 Proxy Statement.

269.     Plaintiff, on behalf of Tingo, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against the Individual Defendants for Breach of Fiduciary Duties

270.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

271.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Tingo's business and affairs. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

272.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Tingo.

273.     In breach of their fiduciary duties owed to Tingo, the Individual Defendants willfully or recklessly caused the Company caused the Company to make false and/or misleading

statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company failed to maintain adequate internal controls; (2) Defendant Mmobuosi had fabricated part of his biography; (3) the Company reported embellished revenue and other accounting metrics that misled investors about the success of the Company; (4) the Company had fabricated claims about its engagement in many of the business activities, such as food processing and mobile technology, that it claimed would be the drivers of future growth; (5) that many of the purported contracts the Company disclosed to shareholders did not actually exist and/or were overstated; (6) in light of the above, the Defendants' statements representing that the Company's business, operations, and prospects were economically successful were materially misleading and/or lacked a reasonable basis at all relevant times.

274.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

275.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

276.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tingo's

securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

277.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

278.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tingo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

279.    Plaintiff, on behalf of Tingo, has no adequate remedy at law.

### THIRD CAUSE OF ACTION

**Against Dozy And Individual Defendants for**
**Unjust Enrichment, Self-Dealing And Control Person Liability**

280.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

281.    By has wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Dozy were unjustly enriched at the expense of, and to the detriment of, Tingo.

282.    Dozy either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Tingo that was tied to the performance or artificially inflated valuation of Tingo, or received compensation or other payments that were unjust in light of Dozy and other Individual Defendants' bad faith conduct.

283.    Plaintiff, as a shareholder and a representative of Tingo, seeks restitution from the Dozy and the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any

performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

284.     Dozy's misconduct alleged herein constituted an abuse of their ability to control and influence Tingo, for which he is legally responsible.

285.     As a direct and proximate result of the Individual Defendants' abuse of control, Tingo has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Tingo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

286.     Plaintiff, on behalf of Tingo, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

**Against Individual Defendants for Gross Mismanagement**

287.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

288.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Tingo in a manner consistent with the operations of a publicly held corporation.

289.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Tingo has sustained and will continue to sustain significant damages.

290.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

291.    Plaintiff, on behalf of Tingo, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against Individual Defendants for Waste of Corporate Assets

292.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

293.    The Individual Defendants caused the Tingo to use Tingo assets to acquire Tingo Mobile and Tingo Foods both of which were fraudulent worthless companies.

294.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Tingo to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

295.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company. .

296.    Plaintiff, on behalf of Tingo, has no adequate remedy at law.

## SIXTH CAUSE OF ACTION

### Against Deloitte for Aiding and Abetting Breach of Fiduciary Duty

297.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

298.    Deloitte provided a clean audit report for Tingo's 2022 financial statements when those financial statements were concocted out of thin air through layman financial engineering.

299.     Deloitte was well compensated to perform an audit of Tingo's 2022 financial statements and financially benefited from Tingo's fraud described herein.

300.     As part of its audit report, Deloitte owed duties to Tingo and was required to perform the requisite due diligence in compliance with PCAOB rules and standards to verify, corroborate, and confirm the revenue, balance sheet, and financial statements of Tingo were correct and accurate to a certain degree.

301.     Had Deloitte conducted the requisite due diligence and complied with PCAOB rules and standards it would have discovered that Tingo was unlicensed to do business and had misstated its revenue, customers, contracts, licenses, balance sheet, and other financial statements.

302.     As such, Deloitte knew or should have known actual knowledge of the breach of fiduciary duty perpetrated by Tingo and facilitated or assisted this fraud by providing a false and misleading audit report for its 2022 financial statements.

## SEVENTH CAUSE OF ACTION

**Against All The Auditor Defendants And Advisor Defendants For Professional Malpractice**

303.     The Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

304.     The SEC's complaint detailed an extensive pattern of financial improprieties, mismanagement and wrongdoing dating back for a period of years.  The Auditor Defendants and Advisor Defendants breached their professional obligations by failing to reveal the myriad improprieties and wrongdoing described in the SEC Complaint. Instead, Auditor Defendants continuously issued accountants' opinions that opined on the fairness and compliance of Tingo's financial statements with generally accepted accounting principles ("GAAP") and never issued anything other than an unqualified auditor's report.

305.    The Auditor Defendants and Advisor Defendants failure to detect and reveal this conduct materially affected the financial reports of Tingo, which Auditor Defendants audited and/or reviewed, by allowing the overstatement of earnings and presenting a materially misleading impression of Tingo's financial condition and operations.

306.    The failures of the Auditors Defendants and Advisor Defendants to audit and/or review the financial reports of Tingo in accordance with prevailing professional standards played an integral role in, and were a proximate cause of, the financial collapse of the company, defaults on multiple loan obligations, and cost Tingo hundreds of millions of dollars.

307.    Plaintiff brings this action to hold the Auditor Defendants and Advisor Defendants accountable for their malpractice, negligence, breach of contract and other failings.

308.    Had Auditor Defendants performed its audits and reviews in accordance with the standards of care imposed on it by the AICPA, Auditor Defendants would have either (i) caused Tingo and/or AFH to report its true financial condition, i.e., a debt-laden company with declining profits and an increasing number of problem loans in its portfolio or (ii) Auditor Defendants audit reports on Tingo's and/or AFH financial statements would have informed the public that the financial statements were not stated in accordance with GAAP or other recognized standards.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)    Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

b)    Declaring that Plaintiff may maintain this action on behalf of Tingo, and that

Plaintiff is an adequate representative of the Company;

c)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Tingo;

d)      Determining and awarding to Tingo the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

e)      Directing Tingo and the Individual Defendants to take all necessary actions to reform and improve Tingo's corporate governance and internal procedures to comply with applicable laws and to protect Tingo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.      proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      provision to permit the shareholders of Tingo to nominate at least three candidates for election to the board; and

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

f)      Awarding Tingo restitution from the Individual Defendants, and each of them;

g)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

h)      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 12, 2024

**SQUITIERI & FEARON, LLP**

By: */s/ Lee Squitieri*
      Lee Squitieri
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 421-6492
Email: lee@sfclasslaw.com

**MOORE LAW, PLLC**
Fletcher Moore (*pro hac vice* forthcoming)
30 Wall Street, 8th Floor
New York, New York 10005
Telephone: (212) 709-8245
Email: fletcher@fmoorelaw.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Michael Ford, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___9___ day of April, 2024.

Michael Ford (Apr 9, 2024 23:35 GMT+2)

Michael Ford